## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Vernon Lamar Jackson, Sr., Individually, *pro se*

**Plaintiff**

Case No.____22-547 C____

**vs.**

The United States Government, Department
Of Justice, Federal Bureau of Investigation, (any
Other known defendants)

**Defendant(s)**

Judge _____

---

## COMPLAINT

COMES NOW the Plaintiff, individually *pro se*, and files this complaint against the defendant(s) as follows:

**JURISDICTION:**   In accordance with 28 USC Section 1346 (a)(2), this court has subject matter jurisdiction and venue is proper for the Defendant(s) as this Complaint is regarding Defendant(s) acting under color of law to willfully deprive Plaintiff of right(s) and/or privilege(s) protected by the Constitution and/or law(s) of the United States, sounding in tort, and the claim is in excess of $10,000 US Dollars.

### A.  PARTIES

**1.  PLAINTIFF,** Vernon Lamar Jackson, Sr., is an Individual representing himself *pro se* with residence located at 9152 Taylorsville Road, #153, Louisville, Kentucky 40299, Telephone No: 502-489-1638. Vernon Lamar Jackson, Sr., is currently the Founder, Chairman and CEO of SmartCopper Broadband, Inc., a new company launched for the purpose of re-introducing "High-speed Broadband Internet Access Services over copper telephone lines into the

telecommunications marketplace."   Previously (1998-2006), Mr. Jackson was the Founder, Chairman and CEO of iGate, Inc., a broadband innovation company headquartered in Louisville, Kentucky, which pioneered the development and implementation of broadband telecommunications over existing copper wire infrastructure, commonly referred to as the "Last Mile". Mr. Jackson has more than 50 years' experience in telecommunications technology design and implementation, and the execution of related telecommunications market operations and planning.  Mr. Jackson specializes in video, audio, and data networks design and deployment via the Public Telephone Network (**20 years engineering experience while employed by AT&T and the Regional Bell Operating Companies**), and customized Private Premises Networks. Since retiring from AT&T, over the last 30 years, in addition to founding iGate, Inc., Mr. Jackson also founded VideoLan Technologies, Inc., Universal Four-Pair, Inc., and L&LD Communications, Inc.  His skills and vision for research and concept(s) development, product development, technology sales and marketing strategies and his unique ability to build strategic corporate and government partnerships, including those with the US Congress, US Army, US Navy, US Secret Service, and corporate relationships including a Multi-million Dollar Manufacturing Contract and a Private Label Agreement with Siemen's corporation (**2002-2006**), a $50-70 million Product Distribution Contract with Samsung corporation (**1994-1996**), a Multi-million Contract with NDTV Communications of Nigeria, Africa (**2003-2005**) and a Multi-million dollar Broadband Internet Access Contract with IO-Global (**2016-2017**), the largest Internet Service Provider in Kabul, Afghanistan. Mr. Jackson co-authored and applied for patents for "Local Area Network for Simultaneous, Bi-directional Transmission of Video Bandwidth Signals". He was awarded the **U.S. Patent # 5537142 on July 16, 1996**. In addition, he was awarded and issued a second **U.S. Patent # 6,240,554 on May 29, 2001**, for the "Transmission and

Equalization of Broadband Signals over Copper Telephone Lines".  Mr. Jackson designed and co-created the award winning VL-2000 Desktop Video Conferencing product for two-way enterprise video, audio, and data transport and switching using the existing telephone wiring. In August of 1995, Mr. Jackson succeeded in taking VideoLan Technologies, Inc., a broadband technology company public (IPO) on NASDAQ, where its' stock traded under the symbol [VLNT] which resulted in its shareholders' and stakeholders' company receiving a valuation of more than **$1 billion dollars**.

Mr. Jackson started his career with AT&T/Bell-Labs in 1970, while still a 17-year-old high-school student in Charlotte, North Carolina. He holds an Associate Degree in Electronics Engineering from the United Electronics Institute, in 1972.

Mr. Jackson's annual salary as Chairman & CEO of iGate, Inc. was **$450,000.00** when the company was shut down by the Defendant(s) due to the **illegal prosecution** of Mr. Jackson.

Plaintiff, Vernon Lamar Jackson, Sr., is herein referred to as the same, "Mr. Jackson" or "Plaintiff," or "I" or "me".

**2.   DEFENDANT**, United States Government, is a government entity with principal offices located in Washington, D.C.  Government is hereinafter referred to as the same, "the U. S. government," "the government," "DOJ," "FBI," "President Joseph Biden," or any and/or all of the other defendant(s) referred to as well as other known/unknown state actors.

**3.  DEFENDANT,** Department of Justice, is a government entity with principal offices located in Washington, D.C.  Defendant, the Department of Justice, may be served by and through the United States Attorney General, Merrick Garland, at his principal place of business, the Department of Justice, 950 Pennsylvania Avenue N.W., Washington, D.C.  20530. Defendant, the Department of Justice, is hereinafter referred to as the same, "DOJ," "FBI",

defendant," or "the government."

4. **DEFENDANT,** Federal Bureau of Investigation (FBI), is the domestic intelligence and security service of the United States, which simultaneously serves as the nation's prime federal law enforcement organization. Operating under the jurisdiction of the U.S. Department of Justice, the FBI is concurrently a member of the U.S. intelligence community. The FBI's white-collar crime work integrates the analysis of intelligence with its investigations of criminal activities such as public corruption and corporate fraud, and reports to both U.S. Attorney General and the Director of National Intelligence.

### B. FACTS PERTAINING TO THE PARTIES

5. **PLAINTIFF,** Vernon Lamar Jackson, Sr. is a United States Citizen who was born in Charlotte, North Carolina. He is a residence of Jefferson County, in the state of Kentucky. He is a 69-year-old widower after 45 years of marriage, a father of 4, a grandfather 0f 11 and a great-grandfather of 2. He retired from AT&T in 1990 and started his own telecommunications companies. Since July 2005, Mr. Jackson has also been "called" to be a "preacher and teacher" of the Word of God/Gospel of Jesus the Christ: being called, elected and sent by Jesus the Christ (not by man) to preach and teach the "True Gospel of Christ" to the "teachers" of the Gospel worldwide. Currently, he is Chairman & C.E.O. of SmartCopper Broadband, Inc. He was the Chairman & C.E.O. of iGate, Inc., the company which was destroyed by the illegal actions of the Defendant(s) during the 2005 – 2006 Jefferson-iGate, Inc. criminal investigation case.

6. **Defendant,** United States Government, is represented in this action by 2 (two) "known" agencies, bureaus or offices, possibly more. The principal members are the Department of Justice, the US Attorney's office and the Federal Bureau of Investigations (FBI).

7. **DEFENDANT,** the Department of Justice (DOJ), is a federal executive department of the U. S. government responsible for the enforcement of the law and administration of justice in the United States.

8. **DEFENDANT,** the US Attorney's Office is the chief federal law enforcement officer within his

or her particular jurisdiction and is the legal party responsible for presenting the case

against an individual suspected of breaking the law, and initiating and directing further criminal

investigations and guiding and recommending the sentencing of offenders.

**9. DEFENDANT,** the Federal Bureau of Investigation serves as the nation's prime federal law

enforcement organization. Operating under the jurisdiction of the U.S. Department of

Justice, the Federal Bureau of Investigation reports to the U.S. Attorney General.

**10.** All of the **DEFENDANTS** are/were government actors, employees, subcontractors and/or

entities of the United States government. All the defendants had knowledge of this

matter and are/were involved in the conspiracy, negligence, and denial of plaintiff's right(s)

resulting in the outrageous government conduct toward him.

### C. FACTS PERTAINING TO THE CASE

**11. <ins>iGate Contracted to Provide Internet Services to 200,000 Users in Nigeria, Africa:</ins>**

In August of 2003, former US Congressman William Jefferson, working thru ANJ (his

wife's company, which was paid by iGate, Inc.- my company, [an Indiana company,

headquartered in Kentucky] to promote iGate's technology and products to the U.S. and

Nigerian marketplaces), was successful in helping iGate to win a multi-million-dollar contract to

provide Broadband Internet Services to TWO-HUNDRED THOUSAND (200,000) consumers in

Nigeria, Africa. iGate signed a Business Agreement and Distribution Contract with a Nigerian

company named NDTV. NDTV paid the first partial payment of the "Technology Transfer" fee

required under the terms of the contract to acquire the "exclusive rights" to use iGate's

"patented" technology and products in the geographic area specified in the iGate-NDTV

contract. However, NDTV was not able to find the money to pay the remainder of the fee

required of them under the iGate-NDTV contract to acquire the aforementioned-rights.

Accordingly, NDTV defaulted and forfeited the opportunity to acquire the exclusive rights to use

Accordingly, NDTV defaulted and forfeited the opportunity to acquire the exclusive rights to use iGate's patented technology in Africa. In early 2004, because of NDTV's default under the terms of the iGate-NDTV contract, iGate "terminated" the contract with NDTV. To keep the Project alive, Congressman Jefferson found a wealthy lady in Virginia (Lori Mody) to be the new investor, whom would provide the funding required to take over the Nigerian Project. When notified of this new investor, NDTV demanded that the money already paid by them before they defaulted should be refunded by iGate.  iGate insisted that the terms of the contract between the parties be adhered to, and accordingly, iGate refused to refund the partial fee payment. NDTV initiated legal action against former US Congressman Jefferson to get their money back.  To keep the Project alive, Congressman Jefferson asked me (iGate) to enlist the help of our law firm (Sidley, Austin, Brown & Wood, LLP) to help resolve the issue. Congressman Jefferson negotiated a Settlement Agreement between NDTV and iGate and it was signed by both parties. Congressman Jefferson also helped to create new terms ("Term Sheet") under which the new investor (Lori Mody), and iGate could move the Nigerian Project forward, including refunding $3.5 million of the initial fees paid by NDTV in accordance with the new iGate-NDTV Settlement Agreement. Mody agreed to pay $3.5 million to satisfy the NDTV refund claim (which was rooted in NDTV's "monetary" claims against Congressman William Jefferson, NOT iGate or its technology rights) and move the deal along. iGate and W2, LLC (Mody's company #1) entered into a Term Sheet Agreement to promulgate the expectations and agreements between the parties on July 21, 2004. The Term Sheet required W2, LLC (the new investor replacing NDTV in the Nigerian Deal) to pay the NDTV refund claim as follows: One Million Five Hundred Thousand and 00/100 ($1,500,000.00) by July 21, 2004, and Two Million and 00/100 ($2,000,000.00) within sixty (60) days of the first payment or by September 22,

2004. iGate agreed (under the Term Sheet), upon receipt of the funds, to meet terms of the NDTV-iGate Settlement Agreement and to "credit" Mody's $3.5 million payment toward the **Forty-Four Million Nine Hundred and Thirty-Four Thousand, Four Hundred and 00/100 ($44,934,400) dollars "Technology Transfer Fee"** required to be paid by W2-IBBS (Mody's company #2) to acquire the exclusive rights to use iGate's patented technology once the African Distribution Agreement was executed by W2-IBBS and iGate, in accordance with the Term Sheet, first, and later in accordance with the **African Distribution Agreement; which would survive and supersede the Term Sheet.** A little more than one month later, iGate and W2-IBBS (Mody's company #2) entered into the formal African Distribution Agreement under which W2-IBBS agreed to pay $44,934,400.00 U.S. Dollars to purchase the "exclusive rights" to sell iGate's patented technology and products in Nigeria, Africa. The African Distribution Agreement met all the "prerequisite" terms mandated by the parties in the "Term Sheet" executed by Mody (W2, LLC) and me (iGate, Inc.) on or about July 21, 2004; including the requirement to enter into the African Distribution Agreement. The African Distribution Agreement was signed by Mody (W2-IBBS) on August 31, 2004, and by plaintiff (me/iGate, Inc.) on September 7, 2004. Once executed, the parties agreed in "paragraph [XXIII. of the Agreement]" that the African Distribution Agreement "superseded" all previous agreements between the parties. Accordingly, Mody (W2, LLC), having already paid the first $1,500,000 to me (iGate, Inc.) under the old Term Sheet, Mody (W2-IBBS), in accordance with the terms of the newly signed African Distribution Agreement, paid the balance of the $3.5 million (remaining $2,000,000.00) to plaintiff (me/iGate, Inc.) on September 22, 2004. The African Distribution Agreement also required Mody (W2-IBBS) to pay additional multi-million-dollar payments toward the acquisition of the exclusive rights to iGate's patented technology as

follows: $2.6 million in October of 2004 and $9.09 million ($9,099,372.00) in January of 2005. However, for some reason unknown to plaintiff (at that time), Mody (W2-IBBS) failed to make additional agreed-upon payments when due under the terms of the African Distribution Agreement. Repeated requests from plaintiff (me/iGate, Inc.) to Mody (W2-IBBS) for explanation(s) as to why the payments were not being made went unanswered. Also, Mody (W2-IBBS) did not reach out to plaintiff, or any other iGate employee/affiliate/agent to communicate any concerns or issues whatsoever related to our agreed-upon duties under the African Distribution Agreement. In December of 2004, Plaintiff contacted Mody again and complained about the "missed" contract payment which was past due from October 2004, and the resulting great financial stress on iGate, its employees and suppliers, as well as delays in the delivery of contracted equipment and services and other resources required of iGate under the African Distribution Agreement. Plaintiff complained informally and formally to Mody, Brett Pfeffer (President of Mody's company) and US Congressman Jefferson.  In late January of 2005, plaintiff informed Mody and Congressman Jefferson of **plaintiff's intent to file suit against Mody (W2-IBBS) for "breach of contract" and her failure to pay the more than $11 million past due to iGate.**  Congressman Jefferson insisted that neither plaintiff nor iGate should file suit against Mody. Rather, he would work through Brett Pfeffer to "handle the matter" with Mody and get back to me.  After hearing of plaintiff's relentless intent to file suit against her from Congressman Jefferson and Brett Pfeffer, during the winter of 2004-2005, in March of 2005, Mody contacted plaintiff and initiated a request for an "in-person" meeting with plaintiff; to take place in her office in Tyson's Corner (Fairfax County), Virginia.  However, what Mody (nor anyone else involved in the Project) hadn't told plaintiff was that in late 2004 to early 2005 Mody had learned that Brett Pfeffer (president of Mody's company) and others (unknown to

plaintiff/iGate) were somehow mis-managing her finances and conducting questionable business transactions without her knowledge.   According to the New Orleans Times Picayune newspaper article [August 2007], and the 'once sealed' 2005 Affidavit: "Mody came to believe that Pfeffer had forged Mody's signature on some documents and that other important documents were missing." According to the Times Picayune, in January of 2005 Mody hired a security consultant (Risk Control Strategies – A Company composed of **retired FBI Agents**) because she was worried about her personal security. Bodyguards were assigned to Mody. And the security consultant staff, along with a New York lawyer-Edward Cox, went through Mody's financial books. According to the Times Picayune and the testimony recorded in the 2005 Affidavit, "something" discovered in Mody's financial books caused Mody to "furlough" Brett Pfeffer from Mody's employment in February of 2005. Neither Mody, Pfeffer or Jefferson informed plaintiff about any of the suspected illegal activities taking place in Mody's companies. In fact, after Risk Control Strategies completed their investigation of Mody's complaint, **they found that plaintiff/iGate was NOT involved with any of Pfeffer's and/or US Congressman William Jefferson's acts of malfeasance,** neither was plaintiff aware that such activities were taking place. Already aware of plaintiff's intent to file suit against her, this news from Risk Control Strategies prompted Mody to reach out to plaintiff and ask for the "in-person" meeting with plaintiff. Mody reached out to plaintiff to "apologize" and to "explain why she didn't make those payments which were past due under the African Distribution Contract".   Plaintiff agreed to meet Mody in her Virginia office, where upon arrival Mody informed plaintiff that **"something is going on"** and **Congressman Jefferson is being investigated by the FBI**, and therefore, Mody said: "**you don't need to file a lawsuit**". Mody warned plaintiff to "be careful".   Plaintiff told Mody that he was not doing anything illegal, and

asked what he should be careful of? Before Mody would provide an answer, she told plaintiff to "hand over his cell phone" because "the FBI might have it bugged". Plaintiff handed over the phone and Mody placed it in her office desk.   Mody then led plaintiff to the elevator where the two of us went up to a higher floor looking for a "quiet" place to talk. Finding no place, she led plaintiff out of the front of the building to a "gushing/noisy" water fountain where we stopped and she began to speak to plaintiff, saying to plaintiff: "**Jefferson is being investigated and there is something you need to know!**"  Before Mody could reveal to me whatever she had in mind, Brett Pfeffer (President of Mody's company) appeared suddenly and asked why we were "hiding" outdoors? Mody, not wanting Pfeffer to hear our conversation, <u>whispered</u> to me: "I will come to Louisville and speak with you in person about what is going on."  The three of us then took the elevator back to Mody's office where I picked up my cell phone and left the building. Before leaving the building, plaintiff reminded Mody of my intent to file suit over past due fees owed to iGate under the African Distribution Agreement and the possibility of "terminating" the Agreement between the parties.  Mody never came to Louisville, Kentucky, nor did she speak to me again about "**the something I needed to know!**".  Because of the illegal actions and advice of the FBI Agent(s), Mody never paid the past due fees owed to iGate, Inc.

**12.  FBI Conducts Search & Seizure, Motion Court To "SEAL" Probable-Cause Affidavit:**

On or about July 30, 2005, the defendant [Law Enforcement Officer – FBI Special Agent Edward S. Cooper] filed an Application with the District Court (Western District of Kentucky) via a "Probable Cause" Affidavit, for a Search Warrant to search Plaintiff's home and business location(s). The Search Warrant was issued on July 30, 2005. On or about August 1, 2005, Defendant(s) [US Attorney's office] filed a   MOTION to "Seal Case" (Application and Affidavit) with the same District Court, **<u>knowing that the Affidavit contained what the defendant(s)</u>**

believed to be "evidence of the commission of a criminal offense", and disclosure to the defendant is constitutionally required when evidence in the possession of the prosecutor or prosecution team is material to guilt, innocence, or punishment. The District Court granted the MOTION and issued an ORDER to Seal Case. On August 3, 2005, the Search Warrant was used to execute the "raid" on Plaintiff's home and business location(s), meaning that an FBI team of Investigators from the Eastern District of Virginia and the state of Kentucky (equipped with a Search Warrant) "visited" Plaintiff's home and business location(s) and removed many documents and files.

On August 4, 2005, the "DOCUMENT" (Seal Case/Application and Affidavit) was SEALED. The DOCUMENT remained Sealed until a MOTION was filed by Defendant(s) [US Attorney's office] to Unseal Application and Affidavit on July 31, 2007, two years later. [This "DOCUMENT" & timeframes become "critical" years later. **See Note in section 25 on page 19.**]

**13. U.S. Attorney Offers Plaintiff a Pre-indictment Plea Agreement:**

On or about September 21, 2005, the Assistant United States Attorney (Mark D. Lytle) of the Eastern District of Virginia sent a letter to plaintiff advising that plaintiff was a "Target" of a federal criminal investigation being conducted in Virginia into violations of federal laws, specifically, Bribery of a Public Official. AUSA Mark Lytle said the office was interested in discussing with plaintiff a possible "pre-indictment" plea. Already aware that iGate and me were struggling financially because of Mody's (W2-IBBS) failure to make the payments owed to iGate under the African Distribution Agreement, AUSA Mark Lytle offered to have an attorney appointed for me by the U.S. District Court for the Eastern District of Virginia.

**14.   Federal Public Defender Appointed for Plaintiff by U.S. District Court:**

On March 3, 2006, the Federal Public Defender for the Eastern District of Virginia contacted plaintiff via a phone call and followed up with a letter informing me that their office had been appointed by the US District Court to represent plaintiff in connection with the federal investigation. On March 9, 2006, I met with the federal public offender in Virginia. In fact, we had several meetings during which I insisted that I didn't want to plead guilty, saying to my defense lawyers: "Congressman Jefferson is a Harvard lawyer, he insisted that the Contract between iGate and ANJ (his wife's company) was completely legal, and the payments and other valuables issued to him and others as they promoted iGate products and services in the U.S. and Africa were legal." My defense lawyers dis-agreed with me and insisted that Jefferson was "deceiving me" in an effort to get me to go along with him in his efforts to make money "illegally" through my company. My defense lawyers agreed with the AUSA Mark Lytle and his team of law enforcement officers [The Defendant(s)] that I was guilty of conspiring with Jefferson; to pay him for performing "official acts" for the benefit of iGate. No matter what I argued, the AUSA Mark Lytle and my defense attorneys insisted that I was guilty and "unless I wanted to be seated next to Jefferson, [whom they say: "is a crook"] in the court room, while a jury ["looked on"] during the trial [because they would "try us together and I would look as crooked as Jefferson"], I had better work out a plea deal with the investigation team. **[Note: At no time during the discussions about the plea deal did the defendant(s) disclose to the plaintiff the existence of the "evidence of criminal offense" and other exculpatory material" recorded in the "sealed" 2005 Affidavit that wasn't already disclosed in the "Criminal Information" and/or the "Statement of Facts".]** If plaintiff had known about the evidence and/or the exculpatory material recorded in the Affidavit, plaintiff would Not have pleaded guilty, nor would he have testified in the Jefferson trial. Plaintiff would have elected to go to trial. **Not knowing** about the existence of the evidence recorded in the "sealed" 2005 Affidavit, **Not knowing** that my defense lawyers were supposed to research the contents of the 2005 "Probable Cause" Affidavit used to issue the Search Warrant for my business and residence location(s), after several "debate sessions" with my defense lawyers, I "gave in" and worked with my defense lawyers to negotiate a plea deal with the AUSA. As part of the plea deal, I was advised to agree to language which would: **"waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case."**

15. **District Court Judge Presides Over Plea Hearing & Approves Plea Agreement:**

On May 3, 2006, US District Court judge T.S. Ellis of the Eastern District of Virginia presided over my 'Plea Agreement' hearing, under which I was advised and agreed with the US Attorney's office to plead guilty to (Count 1) conspiracy to commit bribery and (Count 2) bribery of U.S. Congressman William J. Jefferson for performing 'official acts' on behalf of my company - iGate Incorporated, and I agreed to be a "Cooperating Witness" to testify truthfully in the trial against Congressman Jefferson. Paragraph [10.] of the (Count 1) Criminal Information against me included the following language: **"After attending this and other meetings, Cooperating Witness [CW-1] (Lori Mody) decided to invest in the Nigerian Deal by causing CW-1's company (W2-IBBS) to enter into a licensing and distribution agreement with iGate for the exclusive rights to market and distribute iGate's technology and equipment in Nigeria for a total cost of approximately $45 million."** (This "truthful" language/statement made by the A.U.S.A **"knowingly contradicts"** Mody's (CW-1) testimony in the "SEALED" Affidavit of 2005, as we discovered years later in 2019.)   Whether Judge Ellis was aware of the false testimony in the "sealed" 2005 Affidavit or not, he approved the language in the Plea Agreement and the charges associated with it.

16. **U.S. District Court Judge Accepts Plea Deal and Presides Over Sentencing Hearing:**

On September 8, 2006, Judge Ellis presided over plaintiff's 'Sentencing Hearing'. Before sentencing me, he made the following statement for the record: **"Your personal history and characteristics, I think Mr. Nachmanoff has summarized them very briefly. You've lived a blameless life and have done a lot of good things in your life, and you have accomplished a great deal, starting from a position of relative lack of advantage. You weren't born with a silver spoon in your mouth, and you didn't sort of spring immediately to success. You worked**

hard for it. I see that. I see that. And you have not forgotten the community, and you have worked hard in the community. And I take that also as a given in this. And that is reflected in the Presentence Investigation Report." See – [US v. Jackson (Criminal Action -1:06 CR 161) – "Sentencing Hearing"- Friday, September 8, 2006, Page 16, lines 8 – 21] During the allocution phase standing before the judge, my defense lawyer said the following to him: **"One of the great tragedies of this case, your Honor, is that Mr. Jackson is a talented businessman who has dedicated much of his adult life to trying to provide affordable access to technology to disadvantaged communities, not just abroad, but in this country, as well; as the court referred to, the ability to send broadband and video and audio signals over copper wire. It is a tremendous technology that he has great faith in, as do many other people, and have many other people in the past. But the tragedy of this case, in addition to what has happened to him, is that this technology has yet to reach those communities. And that, I think, hurts him as deeply as anything else."** Notwithstanding those statements, judge Ellis decided I should serve 60 months (5 years), on Count (1) and 87 months (7 years, 3 months) on Count (2) in a federal prison, and 2 years of Supervised Release upon my release from the federal prison.

### 17.  U.S. District Court Orders Plaintiff to Serve 87 Months in Federal Prison:

On March 1, 2007, I reported to the Federal Corrections Institute in Morgantown, West Virginia and began to serve the 60 months and 87 months, respective prison sentences, concurrently. <u>Plaintiff had to lay off all employees and close its offices due to illegal prosecution and imprisonment of its largest shareholder, Chairman, and Chief Executive Officer (me).</u>

### 18.  USA Files Motion to "UNSEAL" (2005) Probable Cause Affidavit:

On July 31, 2007, four months after I reported to federal prison, a motion was made by the USA to "UNSEAL" the Document (2005 Affidavit), and the ORDER was granted to do so on the same day by the District Court in Kentucky. <u>Why was the "evidence" revealed after locking me away in federal prison?</u>

**19.  Plaintiff Transported to Alexander, Virginia to Testify in U.S. v. William J. Jefferson:**

In June – July of 2009, Plaintiff was moved to Alexandria, VA. and prepared for trial testimony by the AUSA and the FBI agents, and I testified on behalf of the Prosecution in the case of the United States v. William Jennings Jefferson **[Case No: 1:07-cr-209]**. In August of 2009, former US Congressman Jefferson was convicted of 11 counts (7 counts involved iGate, Plaintiff and Lori Mody) and later sentenced to 13 years in federal prison.

**20.  Plaintiff Released from Federal Prison, Served 2 Years of Supervised Release:**

In January of 2010, having served forty (40) months, plaintiff was released from federal prison and immediately required to serve the two (2) years of Supervised Release imposed by the Court, which I completed on January 24, 2012. Former US Congressman Jefferson, having exhausted all appeals, reported to federal prison on May 5, 2012, to begin to serve his thirteen (13) year sentence imposed on him by the Court.

**21.  US District Court Dismisses Bribery Charges Against Jefferson and Vacates Sentence:**

On October 4, 2017 (Five years later), the US District Court of the Eastern District of Virginia granted the vacatur with respect to the bribery-related counts arising from Congressman Jefferson's interactions with me and iGate; because it found that the extensive evidence at trial did not establish "that Jefferson took 'official acts' in relation to the iGate scheme within the meaning of the bribery statute as clarified by the Supreme Court's decision

in McDonnell", the  SCOTUS finding: **"that a properly instructed reasonable jury could not have convicted Jefferson"** for his conduct related to iGate, and **"the overwhelming weight of the government's case with respect to the iGate scheme was focused on <u>'constituent service' and other activities that were not criminal.</u>"**  The Court ordered Jefferson to be released from prison, immediately. Accordingly, as Congressman Jefferson was found innocent of violating the bribery statue given the circumstances in which he solicited and accepted inducements from me/iGate, so too is plaintiff innocent of violating the statue in providing them, and thus the US Attorney's Office **"errored"** when it charged plaintiff with conspiracy to bribe and bribery, and it **"errored"** again when it entered into a Plea Agreement wherein it agreed plaintiff was guilty of such charges. Last, certainly the Court made an **"error"** when it accepted plaintiff's guilty plea and the subsequent Plea Agreement. Having already served the unjust and unlawful prison sentence imposed by the Court, the only way for plaintiff to address the Government's **"errors"** was to petition the same Court for relief via a **Writ of Coram Nobis**.

**22.  <u>Plaintiff Seeks to File Writ of Coram Nobis and Vacatur of Conviction:</u>**

On November 17, 2017, plaintiff contacted the Federal Defender's Office which represented me in the Jefferson-iGate matter, and which had advised me to plead guilty and not go to trial.  The Federal Defender reportedly read the Supreme Court's decision in the McDonnell case. Afterward, the "current" Federal Defender told me that both he and the "former" Federal Defender assigned to my case (now a Magistrate Judge) in 2006, **DID NOT** believe I would   qualify for "relief", even if Jefferson's motion was granted due to the Supreme Court's ruling in  the McDonnell case.  This comment was "<u>suspicious</u>" to me since the SCOTUS had rejected the interpretation of "official act" on a unanimous (8-0) basis, and two US District

Court judges had willing accepted the SCOTUS decision and ruled to **vacate** the convictions of two former government officials' (former Virginia governor – McDonnell and former US Congressman Jefferson) convictions related to bribery.  What possible reason could be given for my defense lawyer(s) to believe otherwise?   Had they conspired with the AUSA in 2006?  Accordingly, I rejected the Federal Defenders' assessment and advice and "pushed back"; reciting the District Court's Opinion and response to the Jefferson "2255 Petition" **[Case No:1:07-cr-209]**, the Court saying: "**In summary, the evidence at trial does not support a finding that Jefferson took "official acts" in relation to the iGate scheme within the meaning of the bribery statute as clarified by the Supreme Court's opinion in McDonnell".** And, "**the overwhelming weight of the government's case with respect to the iGate scheme was focused on "constituent services" and other activities that were not criminal."** *Jefferson. Mem. Op.* **[Sect. III (C.) pg.34 - 35]**   Following my push-back, the Federal Defender agreed to file a petition on my behalf, without cost to me. On, December 13, 2017, I (through the Federal Defender) filed a petition for **Writ of Coram Nobis and Vacatur of Conviction** with the same US District Court and the same judge which accepted my guilty Plea.

**23.**  **US District Court Rule Conviction(s) Illegal, ORDER Convictions to Be Vacated:**

On **March 27, 2019**, the US District Court of the Eastern District of Virginia issued an OPINION, stating that my motion for Writ of Coram Nobis and Vacatur of Conviction should be GRANTED. The Court also followed the OPINION with an ORDER, granting my motion for Writ of Coram Nobis and Vacatur of Conviction, stating: **"It is hereby ORDERED that defendant's convictions for (i) conspiracy to commit bribery of a public official, and (ii) bribery as alleged in counts 1 and 2 of the Information, are VACATED." [Case No: 1:06-cr-161]** On April 25, 2019,

the Office of the Federal Defender of the Eastern District of Virginia, counsel for Plaintiff wrote

to me and advised that we should wait until May 25, 2019, an additional sixty (60 days) to

determine if the US Attorney's Office (U.S. Government) was going to file an objection/appeal

to judge T.S. Ellis' OPINION & ORDER. I waited the sixty (60) days. The Government did not

appeal the US District Court judge T.S. Ellis's ruling. Understanding that the Government had no

grounds for an appeal, I took particular notice of judge Ellis's comments noted in his OPINION,

saying: **"it is also apparent, and undisputed by the government, that the defendant continues**

**to face adverse consequences stemming from his convictions…… and Defendant convictions**

**deprive him of certain civil rights….."** See *Jackson_ Mem. Op.* **[Sect. II (C), pg. 7].** Accordingly,

I, the Plaintiff, decided to investigate the US Government for **UNLAWFUL CONVICTION(S)** and

**UNLAWFUL IMPRISONMENT**, which led to the **VIOLATION OF MY FIFTH AMENDMENT Right(s).**

I also decided to investigate how and why I was charged with "any" crime in this case, and to

see if any more of my CIVIL Right(s) have been violated by the U.S. Department of Justice.

24.  **Plaintiff Investigates the Truth Behind Why He Was Charged with Criminal Conduct:**

In June of 2019, being made keenly aware of the unlawful and illegal convictions made

against me by the US government, and realizing that I was now released from the previous

unlawful Plea Agreement (which prevented me from **'seeking information about how my case**

**was investigated and prosecuted'** more than thirteen [13] years earlier), I began to search the

Internet and other sources of information for the "TRUTH" about my case and the people

involved therein. A friend of mine reached out to a friend of his, whom happened to be a

lawyer, to ask what I should look for while trying to research the facts of my case. The lawyer

said the first thing I should look for was the "Probable-Cause" Affidavit, sworn to by the FBI

agent(s) in order to have the Search Warrant issued for my home and business location(s) in

Kentucky and other locations back in 2005 when my case began. I then asked my defense

lawyers which were representing me on my Writ of Coram Nobis Petition case to search my

case files in their possession, looking for the 2005 Affidavit. It was not in my case file, but the associated Search Warrant was in my file. I asked my defense lawyers to ask the prosecutors on my 2005 Jefferson-iGate investigation/case to produce a copy of the 2005 Affidavit. The prosecutors did not respond to my lawyer's request.  No one seemed to know what happened to the 2005 Affidavit or how to find it.

**25.   Plaintiff Discovers Previously "Hidden" Probable Cause Affidavit:**

On **September 20, 2019**, with the help of a "knowledgeable" lawyer from California, I discovered the existence of a 2005 Affidavit which was written as part of the Application process necessary to establish 'Probable Cause' for the issuance of a Search Warrant to search my home and business location(s) in Louisville, Kentucky. The 2005 Affidavit was found in the federal court building in Louisville, Ky. [**US District Court, Western District of Kentucky -**

**Application and Affidavit for Search Warrant, CASE NUMBER: 3:05 MJ - 247]** The 2005 Affidavit was filed with the Court during the 2005 Jefferson-iGate investigation by FBI Special Agent Edward S. Cooper, and it contained both "**lies and known material misrepresentations**" based on interviews of Lori Mody, the government's Witness ("CW-1"), by Special Agent Cooper and Lead Investigator Special Agent Timothy R. Thibault of the FBI. This Affidavit also contained **exculpatory material/evidence** and **impeachable material/evidence** which, would have corroborated plaintiff's "innocence" had plaintiff been made aware of the false testimony made against him in this document in 2005. However, because the Affidavit was "SEALED" upon a motion by the US Attorney, plaintiff (as a defendant) had no way of knowing that the government's witness Mody (CW-1) and the FBI agent(s) had given such false testimony against me to the district court in Kentucky.  According to the "Docket Report", the Application and the Affidavit was filed on Saturday, July 30, 2005, and the Search Warrant was also issued on Saturday, July 30, 2005; predicated on the false testimony and material misrepresentations

presented in the Affidavit. On Monday morning, August 1, 2005, the US Attorney filed a motion to "SEAL" the Application and the Affidavit for the Search Warrant. The Court granted the motion and issued an ORDER to SEAL the case Documents. On August 3, 2005, the Search Warrant was executed, and FBI agents raided my home and business location(s) searching for and seizing files and computer records. On August 4, 2005, the day after the execution of the search of my home and business location(s), the Court "SEALED" the Document (Application and Affidavit). [**NOTE: The Document remained 'SEALED" and "willfully" hidden from the defense (me), while both my defense lawyers and the AUSA simultaneously "urged me" to negotiate a Plea Agreement with the Government. False charges and material misrepresentations made by CW-1 and the FBI were not revealed to the defendant (me). Plaintiff believes that the Federal Defender appointed by the District Court to represent him did not ask to see a copy of the 2005 Affidavit supporting the Search Warrant to see why the FBI was called by Mody in the first place, nor why the FBI raided my office(s) and home.**

On September 21, 2005, the Assistant United States Attorney's office contacted me via a certified letter alerting me that I was a "**Target**" in a federal criminal investigation and expressed an interest in exploring the possibility to enter a "pre-indictment plea" with me. AUSA Mark Lytle of the Eastern District of Virginia, made no mention of the existence of any government's witness testimony against me; neither before I was provided with defense counsel, nor after I was provided with defense counsel. Had I known about such lies and misrepresentations by Mody (CW-1) and the FBI Agents I most certainly WOULD NOT have pleaded guilty to ANY charges alleged by them. In addition, the 2005 Affidavit contained information revealing that Mody (CW-1), a rich "white" woman, received "favorable treatment". She was not charged with bribery, but I was. Now, had I known that Mody was not

charged with "bribery" when she agreed to pay Jefferson for his help to promote "our" business venture in Nigeria, Africa in December Of 2004, I most certainly would not have pleaded guilty to the same charges against me for paying Jefferson to promote our business venture (I was in the same contract with CW-1's company) in Nigeria in September of 2004. As I mentioned before, had I been made aware of the false testimony and material mis-representations against me at the time [recorded in the "Sealed"2005 Affidavit] by Mody, the FBI and/or the US Attorney, first, I would have confronted the accuser(s) with the truth, and second, I certainly would not have entertained even the idea of pleading guilty to ANY of the charges contemplated or levied against me at that time. Again, I did not learn about the false testimony and material misrepresentations against me in the 2005 Affidavit until September of 2019 (**14 years later**), following the US District's Court Order to Vacate my Convictions for (1) Conspiracy to Commit Bribery and (2) Bribery because the government lacked evidence that any crime had been committed by me.

26. **Plaintiff Uncovers "Hidden" Relationship Between FBI Agent and Cooperating Witness:**

In June of 2009, as the corruption case against former representative William Jefferson was about to go to trial, prosecutors learned the following from another "hidden/sealed" Jefferson-iGate related case document, which was "unsealed" out of necessity, the document revealed the following: "According to a statement from Mody (CW-1) included in the unsealed document, she and FBI investigator John Guandolo engaged in "mild intimacy" in New Orleans in April 2005, and that on subsequent occasions Guandolo made "inappropriate sexual advances" in a car, at her townhouse and at her parents' home. On one occasion, she (CW-1) said, he was "overly aggressive", but she fended him off.  Then once or twice, between late April and the end of May 2005, **they had consensual sex.**"  According to court documents

Jefferson's defense attorneys contended that, "[Lead Investigator] Thibault's inability to uncover this serious breach of FBI protocol goes directly to this core competence," particularly because "Thibault was aware that Mody was sensitive and emotionally needy," and that "she was flirtatious and responded in kind to flirtatious comments." Instead, the defense attorneys said, Thibault himself was occasionally flirtatious with Mody and then assigned Mody and Guandolo hotel rooms with an adjoining door when they were at the New Orleans Jazz & Heritage Festival in April 2005. The fact that Thibault, "failed to see any signs that <u>Guandolo and Mody were involved in a personal relationship that lasted for at least several months</u>," the defense said, "raises significant questions about whether Thibault failed to properly supervise the investigation, and about the acuteness of his observations and perceptions."...

Plaintiff was not aware of this "prejudicial" behavior toward me (being the government's 2nd Cooperating Witness), until 2019. This **prejudicial behavior** had taken place during the investigation which began in March of 2005 and explains why Mody (CW-1) was not charged with Bribery when she paid Jefferson (under the W2-IBBS-iGate African Distribution Agreement) to promote our African project in December 2004, but I was charged with Bribery because of the payments that I made to Jefferson's wife company (ANJ) in September 2004, being a party to the same Contract with Mody. It also explains why both FBI Agents investigating the Jefferson-iGate case in 2005 accepted the "un-corroborated" lies and misrepresentations told to them by Mody (CW-1), even though exculpatory evidence to the contrary was in the investigator's possession. Again, had I known about such prejudicial behavior toward me by the investigators on my case in 2005, I would not have agreed to plead guilty to ANY charges against me and I would not have agreed to be a 2nd cooperating witness for the Government. I would have elected to go to trial.

27. **"Racism" and "Racist Profiling" Uncovered in Jefferson-iGate Investigation in 2005:**

On March 6, 2013, Gordon Russell, then a Staff Writer for the Times Picayune newspaper in New Orleans wrote an article titled; "Lead agent in William Jefferson's corruption case recalls victories, near misses," which I found to be a very disturbing article which disparaged me with overtly racist comments and inferences coming from **Special Agent Timothy R. Thibault** who by this time was behaving in a very smug and arrogant manner with respect to my case. These comments were made at the FBI's New Orleans branch where he had gone to make a presentation on Jefferson's and my cases. At this point, he obviously saw no need to put a check on the words which came out of his mouth. Only five months earlier he had received DOJ's Distinguished Service Award for his exceptional contributions in connection with the landmark investigation and prosecution of former Congressman William J. Jefferson and his co-conspirators. This resulted in Jefferson being sentenced to 13 years in prison, the longest sentence ever imposed for a current or former member. Additionally, just four months earlier the U.S. Supreme Court declined to hear Jefferson's appeal. With me having served forty months in federal prison and Jefferson having exhausted all of his appeals and still in the early stages of serving a thirteen-year prison sentence, Thibault again felt no need to apply discipline to the words coming out of his mouth. This article speaks with pride regarding this history making case, which featured the first-ever raid on the offices of a member of Congress and culminated in the longest sentence ever given to a congressman.

I find it extremely perplexing that this article can speak about this first- ever raid on an office of a member of Congress, without also mentioning that the U.S. Court of Appeals for the District of Columbia sided with Jefferson on constitutional issues ... the FBI violated the Constitution with this raid. Why was there such celebration for violating the Constitution to

prosecute a Black Congressman and give him the longest sentence ever for a current or former member of Congress?  Thibault goes on to say the following about me: "Vernon Jackson, the entrepreneur whose broadband technology Mody had hoped to bring to West Africa, had "a horrible bedside manner" and did "the Heisman on her" shortly after Mody wrote him a check for $3.5 million. **First let me address the "dog whistle" which is Thibault referring to my "horrible bedside manner" with Lori Mody, who happens to be a white woman.** Again, I'm a son of the South, born in Charlotte, NC in 1952 and raised there in the 1950's and 1960's. Certainly, there would be consequences for a black man having a "horrible bedside manner" with a white woman because there are many possible consequences. Was he suggesting an Emmett Till moment?  Did Mr. Thibault result to **racial profiling** and **racist inuendo** upon finding that I had not committed any fraud or any other crime(s) against Lori Mody? Perhaps Mr. Thibault believed that I, as a "black man" was "<u>**upsetting the natural order of things!**</u>" After all, following 4-5 months of investigation by the FBI and the US Attorney's office, <u>I was not charged with any violations of any local, state or federal laws, statues or regulations of any sort stemming from doing business with Lori Mody.</u>  Furthermore, it was Mody whom was quoted by the New Orleans Times Picayune reporter Bruce Alpert in August of 2007, as saying: **"she didn't think Jackson should be the fall guy for what she privately called her 'Nigerian fiasco'"**. **One thing is for sure, my bedside manner (whatsoever that means) certainly paled in comparison to the bedside manner of FBI Agent John Guandolo, who was having a "sexual relationship" with Ms. Mody, while the investigation was ongoing. John Guandolo was part of Timothy Thibault's team,** and resigned from the FBI in 2008 at some point after his affair with Ms. Mody became known. Let me share with you **some of John Guandolo's greatest hits since leaving the FBI.** He is a right-wing conspiracy theorist who makes a living as an anti-Muslim

expert. In 2018, BuzzFeed reported that Guandolo said it was 'treason' for former President Obama to address a Muslim organization in the U.S. In the same article he questioned if systemic racism toward African Americans really exists? In a January 8, 2021, Newsweek article, Mr. Guandolo praised the rioting supporters of President Donald Trump for their "restraint" in not killing congressional lawmakers while ransacking the U.S. Capitol. Finally, he says "it is amazing to me that patriots haven't strung up these traitors already with the amount of evidence on the table of what they're doing". It sickens me to know that people with the lack of moral compass' of Mr. Thibault and Mr. Guandolo, who were willing to lie and cheat to prosecute me, sat in positions to destroy my reputation, my business, and attempted to destroy my life.

In addition to defendant(s) racial biases and ungodly tendencies toward me, their conduct while conspiring with Lori Mody against me mirrored that of the prosecutors involved in the former Alaska Senator Ted Stevens' investigation in 2009, wherein "**prosecutors were caught concealing evidence from the defense**", causing then US Attorney General Eric Holder to "abandon" the Stevens case in April of 2009. Republican Senator Lisa Murkowski, also of Alaska, welcomed the Justice Department's decision, but said, "**I am deeply disturbed that the government can ruin a man's career and then say 'never mind.'**" I know exactly how she feels!

To the point that I did a "Heisman on her" shortly after Mody wrote me a check for $3.5 million; **I find this racist "dog whistle" extremely offensive.  Did I strike the Heisman pose, or did I simply take the money and run? This is certainly "racial profiling" and "character assassination"! I would hope that someone who holds the title of FBI Agent would be enlightened enough to understand that not all 6'4" 250 lbs. black men aspire to the Heisman**

**Award. The awards to which I have aspired and received have all been Engineering, Scientific and Technical awards.** Though these words were spoken by Thibault in 2013, eight years after the Jefferson-iGate investigation, and four months after Jefferson went to prison, it is obvious that this same "prejudiced/racist attitude" was prevalent during the 2005 Jefferson-iGate investigation. Finally, Mr. Thibault knew full well that Ms. Mody paid $3.5 million to iGate, Inc. because she was **contractually obligated** to do so consistent with the Term Sheet between iGate, Inc. and Ms. Mody's company for the Nigeria license. The FBI/U.S. Attorney certainly knew that there was nothing illegal regarding me collecting the $3.5 million from Ms. Mody which she was contractually obligated to pay because they had the same Term Sheet with which Ms. Mody and I were working.  They also had a copy of the legally-binding 2004 African Product Distribution Agreement between iGate, Inc. and W2-IBBS (Mody's company) which, upon being executed by the parties on September 7, 2004, superseded the Term Sheet and all other verbal and written Agreements between parties.   However, after my review of previously sealed Search Warrant documents, it's clear that the FBI and the U.S. Attorney lied and misrepresented the fact that the African Distribution Agreement existed to the Judge when they asked him to sign the 2005 Affidavit. It is my belief that Mody (CW-1) "paid FBI Agent John Guandolo with things of value **[SEX]**" in exchange for his conspiring with Lead Investigator Timothy Thibault and AUSA Mark Lytle to commit the "official act" of "deciding NOT to indict her" for "giving things of value" to Jefferson in exchange for what they believed were his "official acts" on her behalf in December of 2004.

I believe there was Quid-Pro-Quo behavior between Mody and John Quandolo, which caused plaintiff (me) NOT to receive "equal protection and treatment under the law" [**The offer of Immunity as given to Mody**].

I want to make two additional points regarding Thibault's 2013 meeting in New Orleans where he also said the following: "**The case (Jefferson-iGate case) was built on <u>the theory that the congressman took bribes in exchange for "constituent services" – using his influence to help Americans do business in Africa.</u> Prosecutors were initially "skeptical" about the case because there was little precedent for it. "If you're a prosecutor, you don't like that," Thibault said.** What Thibault didn't say was the prosecutors were skeptical **(had "reasonable doubt")** because they already knew paying bribes for "constituent services" is an oxymoron, because paying for "constituent services" is legal and therefore NOT a bribe or a crime. **Paying for "official acts" of government is a bribe and illegal. Their ill-fated theory was destined to fail, which it did. In fact, US District Court judge T.S. Ellis, III wrote in his OPINION to vacate plaintiff's convictions the following: "the overwhelming weight of the government's case with respect to the iGate scheme was focused on "constituent services" and other activities that were not criminal." Even the judge was aware that the Jefferson-iGate trial was based on the "theory" that the plaintiff paid the US Congressman for providing "constituent services" and other activities that were not against the law.  Both the SCOTUS and the US District Courts ruled that the "theory of the FBI and the Prosecutors [that they could indict/charge someone for "paying a government official for providing constituent services"] did not work!**

**Accordingly, I was collateral damage in DOJ's overzealousness to prosecute Jefferson who was the "big fish" they wanted. However, they had to use lies and misrepresentations in order to investigate and prosecute the case against me. My life was turned upside down and my company shut down with the country still looking for an economical solution to the Digital Divide which only the plaintiff and my company has the knowledge to produce. According to**

**Lead Investigator Tim Thibault, this was all done based on an ill-fated theory that the Prosecutors never really believed in to begin with.**

**28. PLAINTIFF Experiences "Denial of Access" to Financial Services Organizations, Investment Bankers and Individual Investors because of illegal "Felony" on His Record and the Internet:**

I continue to try to market the company's technology. In the spring of 2016, I used some of the proceeds of an unrelated legal settlement to conduct demonstrations, pilot installations, and tests of iGate technology to re-prove its validity as a real solution for the marketplace. In January of 2017, based in part on one such demonstration, iGate landed a contract to provide broadband internet services to Io Global Services, an Afghani internet service provider. The contract includes a purchase order for $1.7 million in equipment installation in Kabul, and the provision of service thereafter. If iGate can perform, it can expect to generate approximately $3 million in revenue in year one alone. The open-ended/multi-year contract required iGate to make its first delivery of equipment to the customer on November 4, 2017. As of today, iGate has not been able to deliver the product on time due to lack of financing.

I have reason to believe that **my conviction** is the major impediment to obtaining the financing needed to bring iGate's technology to market. After award of contract, I engaged the services of Joseph Caruso of Omnifirst Group, a capital creation firm, to help iGate obtain financing to fund its performance of this (or other) contracts. He has given me his opinion that the conviction makes bankers and/or investors wary or unable to partner with iGate, and he has told me about at least one potential investor who explicitly conveyed this to Mr. Caruso.

iGate applied for a Small Business Administration ("SBA") loan through a participating bank, Berkshire Bank, to fund its performance of this contract. According to

Mr. Caruso, Phil Martin, a First Vice President at Berkshire Bank, told Mr. Caruso that he was impressed with information that I had sent to him, and thought that the project was bankable, but that his bank could not agree to loan money to iGate **because of my conviction**.

As of April 8, 2022, the "injury" continues. I met with another prospective capital investment company in an effort to raise the capital to re-launch the company and it's technology into the broadband marketplace. The Chief Executive Officer of that company made it very clear to me that raising capital for me was not possible, saying unto me: *"Because of the information that is available on the internet, the damage done to your reputation is incalculable in terms raising capital. Although any charges were vacated, the information that is there that associates you with illegal activities, makes it impossible for us to raise capital on your business. It should be noted that this is not a reflection on the technology, nor of our personal high regards for you. It is an issue of the government having so besmirched your character, that it has made it impossible for you to get a fair assessment as an investment opportunity."* **[Letter Attached Hereto as Exhibit "C"]**

### D.   LAW AND ANALYSIS

Defendants in this matter violated state laws, national laws and statues, including but not limited to: criminal conspiracy/collusion, fraud by commission, fraud by omission, misrepresentation/concealment, ineffective assistance of counsel, defamation, detrimental reliance, ineffective assistance of counsel and outrageous conduct causing severe emotional distress (tort of outrage). Defendants engaged in abuse and misuse of power, obstruction of justice and outrageous government conduct in this matter.

According to the law **28 USC 2675 (a)** [Federal Tort Claim Procedure], a plaintiff may not submit an FTCA action against the United States unless (1) the plaintiff has "first presented the claim to the appropriate Federal agency" whose employees are responsible for the plaintiff's alleged injury, and (2) that agency has "finally denied" the plaintiff's claim. Plaintiff submitted his claim **[Exhibit "F"]**, within the two-year statute of limitations window (**which began on 3-27-2019**) to the Department of Justice (US Attorney's Office of the Eastern District of Virginia, which acknowledged receipt as of March 16, 2021, and forwarded the claim to the U.S. Department of Justice – Civil Division, Torts Branch, Washington, D.C., by electronic mail on March 24, 2021 **[Exhibit "G"]**). Defendant(s) failed to answer Plaintiff's claim within the FTCA-mandated "6 month" timeframe. Plaintiff waited until after the 7th month of on-compliance by the DOJ and decided to write a letter to the United States Attorney General – Merrick Garland, the head of the US Department of Justice, asking him to settle plaintiff's multi-million-dollar claim.

Plaintiff wrote to Mr. Garland on November 3, 2021. Mr. Garland's office received the letter from plaintiff on      November 4, 2021. Failing to receive a reply within 30 days, plaintiff wrote a second letter to US Attorney General Garland on December 3, 2021 **[Letters attached as Exhibit "A" & "B"]**. After more than 8 months, defendant(s) responded to plaintiff via a certified letter stating that my claim was "not compensable" and accordingly "denied" **[ Exhibit "D"]**. Defendant(s) informed plaintiff of my option to file suit against the US Government within 6 months of the date written on the Letter of "denial of claim" by defendant(s). **That date is November 19, 2021.**

Finally, under the FTCA the "Intentional Tort Exception" has shielded the United States from liability for serious acts of misconduct allegedly committed by federal officers. However,

the Intentional Tort Exception has a "carve-out" known as the "**Law Enforcement Proviso**" that renders the United States liable for intentional tort claims committed by "**investigative or law enforcement officers of the United States Government**".  Two (2) of the Six (6) torts which fall into the law enforcement proviso's ambit are: (1) **Abuse of Process** and (2) **Malicious Prosecution**; both of which are applicable in plaintiff's case against the United States DOJ.

The United States Court of Federal Claims has jurisdiction in this matter, since defendant(s) being government actors/entities at the relevant time(s), violated federal laws in this matter and issued a "Target Letter" against the plaintiff without a legal and just cause, but based on an illegal **"skeptical"** theory which caused the malicious and unjust prosecution of plaintiff.

The defendant(s) participated in a scheme to "take down" former US Congressman William J. Jefferson and to simultaneously eliminate a multi-million-dollar lawsuit threat against Lori Mody for "breach of contractual duties" owed to iGate Incorporated, plaintiff's company. The defendant(s) participated in a scheme to cause plaintiff intentional emotional distress by "intimidating" plaintiff into changing his mind about suing Lori Mody.  The overt acts engaged in by all defendant(s) to cause plaintiff severe emotional distress include, but are not limited to: telephone calls, meetings, verbal and written communications, and mental processes.

Plaintiff alleges each of the following claims separately against each of the defendant(s) as designated unless stated otherwise. In addition, plaintiff contends that each of the fraud-related claims are stated with particularity. The plaintiff is within the two-year statute of limitations for filing this suit, since he was not aware that he had the right to file fraud claims

until **March 27, 2019**; the day the US District Court judge issued an ORDER to vacate all convictions against plaintiff **[Case 1:06-cr-161-TSE, Document 59, Filed 3/27/19, Page #1 of 1, Page ID# 378]**. Plaintiff also understood that defendant(s) had 60 days (**until May 30, 2019**) to appeal the US District Court judge's ORDER. Defendant(s)decided not to appeal the District Court judge's grant of Writ of Coram Nobis and Vacatur of Convictions.  Therefore, Plaintiff is within the two-year statute of limitations for his claims involving unjust conviction and illegal imprisonment, criminal conspiracy/collusion, fraud by omission, fraud by commission, misrepresentation/concealment, ineffective assistance of counsel, defamation, detrimental reliance and outrageous conduct causing severe emotional distress (tort of outrage).

According to the Court record(s), the defendant(s) action(s) and/or the lack thereof led to: **(1) violation plaintiff's right** to due process of law under the 5th Amendment (As applied to the states under the 14th Amendment). Due Process commands that defendants have the right to call their own witnesses, mount their own evidence, and present their own theories of the facts.  In order to properly mount a defense, the prosecution must turn over all evidence that will be presented against the defendant and allow the defendant "pre-trial access" to question the prosecutor's witnesses.

According to the 2005 Affidavit **[Case No: 3:05 MJ-247]**, page 50, **Section VII. CONCLUSION**, defendant(s) wrote and swore to the following: "**Based upon the foregoing information and my knowledge, training and experience in the investigation of public corruption and fraud, I respectfully submit that the <u>fruits of evidence of the commission of a criminal offense</u>, as described in Schedule B (<u>Bribery and Conspiracy to Commit Bribery</u>), will be found at the premises listed and described below in schedule A, and therefore a search**

warrant should be issued for 4404 Century Road, Louisville, Kentucky….." The defendant(s) in this case willfully received false testimony and misrepresentations as **evidence** (including accepting a "legally-expired" 2004 Term Sheet as a "legally active" Term Sheet in 2005) from Mody (CW-1), willfully attested to the false testimony and misrepresentations as truthful evidence, and willfully "motioned" the US District Court to "Seal" the Affidavit containing the false testimony and misrepresentations; to "hide" the evidence from plaintiff so that plaintiff was not aware of its existence as plaintiff contemplated an offer by defendant(s) to enter into a "pre-indictment" plea agreement; **(2) violation of plaintiff's right** to know who my accuser(s) is/are, the nature of the charges and evidence against me, and to confront them **"intelligently" before I pled guilty or not guilty**, as guaranteed under the 6th Amendment; **(3) violation of plaintiff's right** to receive "exculpatory material evidence" and "impeachable material evidence" gathered by the FBI agents during the 2005 investigation, as guaranteed under the 5th Amendment, **(4) violation of plaintiff's right** to equal protection under the law(s); the 14th Amendment provisions mandating the government (defendants) to treat persons in similar situations equally and impartially under the law as mandated in the U.S. Constitution, **(5) violation of plaintiff's right** to: due process not to be deprived of property (income and assets) under the 5th amendment (As incorporated to the states through the 14th amendment) and **(6) violation of plaintiff's natural right** to: "life, liberty and the pursuit of happiness" under the Declaration of Independence, and the Color of Law **42 USC 1983/18 USC 242**. The federal criminal statute that enforces Constitutional limits on conduct by law enforcement officers is 18 U.S.C. Sect. 242. Section 242 provides in relevant part: "Whosoever, under color of law, …willfully subjects any person…to the deprivation of any rights, privileges, or immunities

secured or protected by the Constitution or laws of the United States [shall be guilty of a crime]."

There is no doubt defendant(s) willfully and selectively chose "not" to indict Mody (CW-1) **[granted immunity to her]** for paying/giving things of value to Jefferson in exchange for what investigator(s)/prosecutor(s) called "official acts" performed by Jefferson on her behalf in December of 2004.   Mody (CW-1), who paid Jefferson as part of the same African Distribution Agreement through which Mr. Jackson paid Jefferson, was not charged with bribery although defendant(s) levied a bribery count against Jefferson involving Mody at Jefferson's arraignment. Of the 11 Counts levied against Jefferson, "count 4" involved Mody paying Jefferson as a bribe and "count 3" involved me - the plaintiff paying Jefferson as a bribe.  There is no doubt defendant(s) willfully withheld from plaintiff the same offer of "immunity", even though plaintiff also agreed to be a Cooperating Witness, and unlike Mody (CW-1) plaintiff agreed to testify and did testify at Jefferson's trial for 5 days.

Mody did not testify at trial because she did not want to be questioned about her illegal sexual relationship(s) with the FBI during the 2005 Jefferson-iGate investigation. There is also no doubt defendant(s) willfully violated plaintiff's 14th Amendment rights by engaging in "selective prosecution".  The defendant(s) in this case were involved in conducting a criminal investigation based on an unjustifiable standard of "racial profiling" and the arbitrary classification of "sexual favor", both of which are unconstitutional and unlawful.

### E.  CAUSES FOR ACTION

### Civil Conspiracy/Collusion

**29.**    Plaintiff incorporates by reference the above numerical sections 1-27 of this Complaint. The conduct of all defendants in devising a plan to cause Mr. Jackson to believe he was involved in a scheme to defraud Lori Mody (CW-1) out of $3.5 million, including but not limited to: **(1)** accusing Mr. Jackson of working with Brett Pfeffer and U.S. Congressman William Jefferson in a "fraud and bribery" scheme, **(2)** accusing Mr. Jackson of selling rights to technology to Mody's company that were already sold to another company, **(3)**  accusing Mr. Jackson of not having proof of ownership of technology rights, **(4)** attempting to help Lori Mody (CW-1) get out of paying **$11 million in past-due Contract fees owed to iGate**, by saying: "the African Distribution Contract between iGate, Inc. and W2-IBBS Ltd does not exist" and **(5)** attempting to "intimidate" Mr. Jackson into NOT filing a lawsuit against Mody for past-due Contract fees owed to iGate, by having Mody say to him: "The FBI is investigating Jefferson, so don't file a lawsuit against me" and **(6)** defendant(s) working with Mody to "hide" the truth of the fact that plaintiff had not committed any fraudulent acts against Mody, nor had plaintiff violated any local, state or federal laws, **thus causing defendant(s) to create the "false charge(s) of  paying Jefferson for performing official acts or bribery. Defendant(s) willingly conspired with Mody to make false charges against plaintiff, knowing that the evidence to support such charge(s) was "in-doubt", in exchange for sexual favors and money from Mody, and** to drag the matter out to deplete plaintiff of his assets constitute civil conspiracy/collusion.

By participating in the above fraudulent acts, and failures to act, the defendant(s) acted with the intent of defrauding Mr. Jackson into believing that he was at fault in the aforementioned scheme, having full knowledge that such acts were substantially certain to

result in injury and detriment to Mr. Jackson.  Some of defendant(s) "false" sworn testimony [and plaintiff's rebuttal thereto], is taken from the formerly "hidden" 2005 Affidavit and recorded below:

**A.  Lies/Material Misrepresentations Recorded in FBI Affidavit Filed on 7-30-2005 [US District Court, Western District of Kentucky - Application and Affidavit for Search Warrant, CASE NUMBER: 3:05 MJ-24]**

**1. Page 3, Part III, Section 5:** "Investor-Lori Mody approached the FBI and told them that she had been a victim of a fraud and bribery scheme involving Vernon Jackson (Plaintiff), Brett Pfeffer and U.S. Congressman William Jefferson":

**a.** Lori Mody alleged that I and others conspired to defraud her out of $3.5 million which] was paid to iGate with the "understanding" that iGate would use the money to "reacquire" the rights to the technology from another company that had already "bought the rights to the technology from iGate. **This is a LIE!**

**b.** Lori Mody also alleged that "I could not produce proof" that those rights, which Mody was to use for a venture in Nigeria had been "reacquired".   **This is a LIE!**

**Plaintiff's Rebuttal to Statements 1(a) and 1(b) above:** The FBI agents, during the investigation, had in their possession a copy of the Contract/Agreement between Mody's company and iGate; which clearly defined that the rights to iGate's technology had to be purchased for approximately $45 million US Dollars. The iGate technology rights were never ACQUIRED by either the Nigerian Company (NDTV) or by Mody's company (W2-IBBS). In addition, iGate clearly owned [at the time] the rights to its technology, which rights were applied for and granted to iGate by the US Patent and Trade Office under **US Patent No. 5,537,142 and US Patent No. 6,240,554.**

**Further Clarification and Correction(s) of Misinformation and Lies Recorded in Affidavit**

**c.** The Nigerian company, NDTV, which was under a Business Agreement/Distribution Contract with iGate, through which it could acquire EXCLUSIVE access to iGate's technology, for a fee of approximately **$45 million**, to be paid in accordance with the terms of the Agreement, **DEFAULTED** in the terms of the Agreement, paying only $6.5 million. Accordingly, iGate notified NDTV of its Breach of Contract. After several months, NDTV could not raise the money needed to acquire the Rights to the technology which was required to complete the Project. iGate notified NDTV of its decision to terminate the Distribution Agreement. NDTV then demanded a refund of the $6.5 million which they had already paid. iGate refused to refund the money because of all the expenditures it had already incurred in its preparation to launch the Nigerian Project with NDTV. Therefore, the rights to iGate's technology were never transferred to NDTV. This information was disclosed to Mody on more than one occasion.

**d.** The "rights" that Mody is referring to **(mistakenly)** are those which are recorded in the "TERM SHEET" (dated July 21, 2004), agreed to (signed) by me/ iGate and W2/Mody. Those "rights and claims" are those of NDTV which they erroneously believed they were entitled to and insisted on "getting a refund of their initial partial payment".  Because iGate refused to refund the partial payment of $6.5 million, NDTV hired a lawyer to threaten U.S. Congressman William Jefferson and me/iGate, alleging "wrong-doing" on our part. Congressman Jefferson said that iGate (in the best interest of all parties) should work with NDTV to find a solution to the problem so that he could find another investor to take over the Project.  Jefferson, working with and thru iGate's legal counsel (Aiken & Gump) negotiated a Settlement Agreement with NDTV and the TERM SHEET mentioned above. **The $3.5 million was used in the repayment of NDTV's NEGOTIATED REFUND**, in accordance with the TERM SHEET & the NDTV Settlement

Agreement. This amount was to be credited to W2-IBBS as partial payment toward the approximately $45 million fee it was required to pay to acquire the EXCLUSIVE RIGHTS to the iGate technology under the iGate-W2-IBBS African Distribution Agreement.

2. **See page 11, Section V, Part B., Paragraph 16:** Here, **FBI agent Cooper falsely testifies:** "Jackson told CW that he had secured an agreement from Bell Laboratories enabling him to market Triple Play outside of the company and had set up iGate to do so."

a. **This is a LIE.** Jackson retired from AT&T on March 1, 1990. Jackson had NO post-retirement agreements of any kind with AT&T, Bell Laboratories or any affiliate of either entity. Jackson created Triple Play technology in 1995 and U.S. patents were awarded and issued to his companies VideoLan Technologies, Inc. in 1995, and iGate Inc. in 2001.

3. **Also see page 12, Section V, Part B., Paragraph 18:** Here, Mody provides a copy of the TERM SHEET to the FBI which calls for Mody to pay iGate **$44,934,400 to secure the EXCLUSIVE RIGHTS** to use iGate's patented technology and equipment to support the Nigerian Project. Later, on the same page, Mody tells the FBI: "it was her understanding" that she would be paying $3.5 million to be forwarded to NDTV to secure the **same EXCLUSIVE RIGHTS** to use iGate technology. **Obviously, both statements can't be true**!   Furthermore, I am sure that Mody knew the difference at the time when she made the statement(s) to the FBI, because she had entered into the African Distribution Agreement with iGate on **9-7-2004**; under the agreed-upon terms by which she was to acquire the RIGHTS to the iGate technology. Once executed,

the African Distribution Agreement **superseded all prior agreements** between the parties (including Term Sheet, in accordance with **Section XXIII of the African Distribution Agreement**).

**a.** Further evidence of Mody's false testimony given in the previously "sealed" 2005 Affidavit was revealed during my testimony at Jefferson's trial in 2009, when the prosecutor asked me about the money paid to iGate by Mody and what I did with it. Under oath, I testified that I paid NDTV in accordance with the negotiated iGate-NDTV Settlement Agreement which called for iGate to pay a portion of the $3.5 million fee in installments to NDTV and the balance to be paid as Mody paid her payments to iGate under the African Distribution Agreement. **[U.S. vs William J. Jefferson, Case No. 1:07-cr-209 (6/9/2009 - thru - 8/5/2009, Government Exhibit 1-99].**

**4. Page 14, paragraph 23:** "In February 2005, CW began to ask Jackson questions about iGate's finances and requested verification that CW's previous investment of $3.5 million had been used to acquire the rights to iGate's Triple Play technology in Nigeria as was previously represented to CW by Jackson. <u>Jackson refused </u>and CW broke off ties with him."

**a. The statement made by Mody (CW) in number 4 above is also false testimony.** CW knew that she did not pay $3.5 million to acquire the rights to iGate's technology. Rather, in accordance with the Term Sheet signed by both she and I, and the **"superseding"** iGate-W2-IBBS African Distribution Agreement, also signed by both of us, the $3.5 million was paid to resolve claims made by the Nigerian company NDTV against William Jefferson and **<u>had nothing to do with iGate technology rights.</u>** However, I did agree to give unto her a $3.5 million "credit"

toward the W2-IBBS contracted right to acquire the iGate technology in an amount of approximately $45 million. And plaintiff **"DID NOT"** refuse to answer Mody's written "request for information" which was sent to me via email from her attorney, Joel Birken on February 9, 2005. Plaintiff sent a two-page answer to Mody. **[See Answers in Exhibit "E" attached hereto]**

**5. Page 41, paragraph 77: (1)** "As was discussed previously, in August and September 2004, CW wired $3.5 million to Jackson's iGate bank account so that iGate would, as represented to CW, pay NDTV for the purpose of extinguishing NDTV's rights to iGate technology so that CW's Nigerian company would hold exclusive rights to the technology for its use in Nigerian business ventures." And **(2)** "Jefferson and Jackson can be heard discussing a specific debt by iGate to NDTV, which I believe, based on my knowledge of the facts of this investigation, is further evidence that Jackson did not forward the entirety of CW's 2004 payment of $3.5 million to NDTV as was previously represented."

**a. Statement 5(1) above is false testimony and is disputed as follows:** No such representation was made to CW! **The $3.5 million was used in the repayment of NDTV's NEGOTIATED REFUND**, in accordance with the TERM SHEET signed by Mody/W2 and me/iGate, on July 9, 2004, and the NDTV Settlement Agreement signed by Otunba Fashawe, chairman of NDTV and me/iGate. This amount was to be credited to CW's company "W2-IBBS" as partial payment toward the approximately $45 million fee it was required to pay to acquire the EXCLUSIVE RIGHTS to the iGate technology under the iGate-W2-IBBS African Distribution Agreement.

**b. Statement 5(2) above is also false testimony and is disputed as follows:** Again, no such representation was made to CW! The reason that Jackson did not forward the entirety of CW's 2004 payment of $3.5 million to NDTV was because of the **new terms** of the NDTV-iGate Settlement Agreement (approved by Mody and Congressman Jefferson after 'execution' by Fashawe and Jackson), and Mody's (W2-IBBS's) failure to make timely payments to iGate as required under the new African Distribution Agreement.

**6. Page 42, paragraph 80, line # 8:**  [CW later told Jefferson "Which brings me to the fact that I still haven't seen the NDTV transfer of rights. For all I know, two people do have it right now."] (Law enforcement believe that the two "people" are CW and NDTV).

**a. CW, Law enforcement and Jefferson** were all aware of the signed African Distribution Agreement between W2-IBBS and iGate, Inc., <u>which clearly stated that neither Mody (CW-1) nor NDTV owned the rights to the iGate technology for use in Nigeria, Africa or any place, until the fee of approximately $45 million was paid in full to iGate, Inc.</u>

<u>**Fraud by Commission**</u>

**30.**  Plaintiff incorporates by reference the above numerical sections 1-29 of this Complaint in which fraud is stated with particularity. misrepresentation of the truth and concealment of material facts to induce plaintiff to act to his detriment.

The overt acts of fraud engaged in by the defendant(s) include, but are not limited to: telephone calls, meetings, verbal and written communications and mental processes, and the unjust and illegal issuance of a "Target Letter" against the plaintiff.

At all relevant times, the above defendant(s)' participation in the schemed plan to cause plaintiff severe emotional distress, was willful and wanton, and with full knowledge that such conduct was substantially certain to result in injury and detriment to plaintiff. The defendant(s)' conduct constitutes fraud by commission.

As a result of defendant(s)' fraud by commission, plaintiff has been damaged in excess of **$16, 466,666.00 dollars.**

WHEREFORE, plaintiff respectfully request a judgment of the court against the above-named defendant(s) awarding to plaintiff (i) damages in excess of **$16,466,666.00 dollars**; (ii) injunctive relief enjoining defendant(s) from continuing their harm and (iii) any other relief deemed just and equitable by the court.

### Fraud By Omission

**31.** Plaintiff incorporates by reference sections 1-30 of this Complaint, in which fraud is stated with particularity.

The failure of the defendant(s) to admit the truth concerning the fact that defendant(s) caused the illegal prosecution of Plaintiff constitutes fraud by omission.

The failure of the defendant(s) to provide to plaintiff due process under the law and failure to ensure that the process while investigating charges is proper and fair and plaintiff's rights are preserved constitutes fraud by omission.

The failure of defendant(s) to follow the federal criminal statute that enforces Constitutional limits on conduct by law enforcement officers **[18 U.S.C. § 242]** constitutes fraud by omission. The care of these defendants was insufficient and substantially misrepresentative. The defendant(s) failed in their duty to the plaintiff.

As a result of defendant(s)' fraud by omission, plaintiff has been damaged in excess of **$16, 466,666.00 dollars.**

WHEREFORE, plaintiff respectfully request a judgment of the court against the above-named defendant(s) awarding to plaintiff (i) damages in excess of **$16,466,666.00 dollars**; (ii) injunctive relief enjoining defendant(s) from continuing their harm and (iii) any other relief deemed just and equitable by the court.

### Intentional Fraud

**32**.  Plaintiff incorporates by reference sections 1 through 31 of this Complaint, in which fraud is stated with particularity.

At all relevant times, the appropriate defendant(s) recognized that their fraudulent overt acts (including, but not limited to, telephone calls, communications, meetings, "mental processes") devised a scheme to obstruct justice in the matter of the illegal prosecution of plaintiff knowing that it would result in mental anguish and severe detriment to Mr. Jackson.

The appropriate defendant(s)' conduct was to inflict emotional distress by abusing their power.  The conduct of the defendant(s) constitutes intentional fraud.

43

As a result of all the defendant(s)' intentional fraud, plaintiff has been damaged in excess of **$16,466,666.00 dollars.**

WHEREFORE, plaintiff respectfully requests judgments of the court against all defendants awarding to plaintiffs(i) damages in excess of **$16,466,666.00 dollars** for each defendant singularly, and/or jointly, and (ii) injunctive relief enjoining the defendants from continuing their harm; and (iii) any other relief deemed just and equitable by the court.

## Misrepresentation/Concealment

**33.**   Plaintiff incorporates by reference sections 1 through 32 of this Complaint.

The appropriate defendants' participation, in the schemed plan to cause Mr. Jackson severe and prolonged emotional distress, constitutes a knowing misrepresentation of the truth and concealment of material facts to induce plaintiff to act to his detriment.

At all relevant times, the plaintiff was unaware of the appropriate defendant(s)' participation in the schemed plan to cause him emotional distress as they acted with willful rendering of perfect performance in their respective positions.

The appropriate defendant(s)' participation in the schemed plan to cause the plaintiff emotional distress was with the intent and full knowledge that their conduct was substantially certain to result in injury and detriment to the plaintiff.

By participating in the schemed plan to cause the plaintiff emotional distress, the conduct of the appropriate defendant(s) constitutes misrepresentation/concealment.

44

As a result of the defendants' misrepresentation/concealment, plaintiff has been damaged excess of **$16,466,666.00 dollars.**

WHEREFORE, plaintiff respectfully request judgments of the court against the above-named defendant(s) awarding to plaintiff: (i) damages in excess of **$16,466,666.00 dollars**; (ii) injunctive relief enjoining the defendants from continuing their harm; and (iii) any other relief deemed just and equitable by the court.

### Detrimental Reliance

**34.** Plaintiff incorporates by reference sections 1 through 33 of this Complaint.

In seeking legal assistance through the office(s) of the government because plaintiff lacked the finances to pay for his own legal defense, plaintiff relied upon the representations of these defendant(s) that lawyers appointed by the government were competent and accomplished lawyers with considerable experience and knowledge.

In seeking legal assistance, plaintiff relied upon the representations of the government, the state, and others that the legal system provides "justice for *all,*" as stated in the Pledge of Allegiance.   Plaintiff relied in good faith upon representations made by the above defendant(s).

Plaintiff was justified in his reliance.

Plaintiff relied to his detriment and as a result suffered damages in excess of **$16,466,666.00 dollars.**

WHEREFORE, plaintiff respectfully request a judgment of the court against the defendant(s) awarding to plaintiffs (i) damages in excess of **$16,466,666.00 dollars**; (ii) injunctive relief enjoining the defendant(s) from continuing their harm; and (iii) any other relief deemed just and equitable by the court

**Violations of Plaintiffs' 5th Amendment Rights (as incorporated to the States through the 14 th Amendment)**

**35.** Plaintiff incorporates by reference sections 1 through 34 of this Complaint.

The conduct of the appropriate defendant(s) in depriving Mr. Jackson of life, liberty and property (income and assets) without due process of law, constitutes a violation of his rights under the 5th Amendment to the United States Constitution, as incorporated to the States through the 14th Amendment.

The appropriate defendant(s) owed Mr. Jackson a duty under the 5th and 14th Amendments not to violate his rights under the United States Constitution as a citizen of the United States.

The defendant(s) owed Mr. Jackson a duty under the 5th and 14th Amendments not to violate his rights under the United States Constitution as a citizen of the United States. The defendant(s)' overt acts of fraud denied him due process of law by influencing his attorneys through ineffective assistance of counsel.

Further, the conduct of the defendant(s) to participate in a conspiracy to deprive Mr. Jackson of his income and assets, and his right to be heard, was an obvious interference with

attorney/client privilege.   Plaintiff relied in good faith that the attorneys, judges and other court officials would act legally and ethically while conducting investigations and hearing(s).

The illegal and unethical conduct of the defendant(s) constitutes denial of plaintiff's due process rights under the 5th and 14th Amendments to the United States Constitution.  The defendants breached the duty owed Mr. Jackson and willfully deprived him of his property and his right to be heard.

The defendant(s) breached the duty owed plaintiff and caused Mr. Jackson's illegal prosecution and unlawful imprisonment.

Further, as a result of the defendant(s)' conduct in depriving Mr. Jackson of life and liberty and property without due process of law, plaintiffs have suffered harm in excess of **$16,466,666.00 dollars**.

WHEREFORE, plaintiff respectfully request judgments of the court against all of the defendant(s) awarding to plaintiffs (i) damages in excess of **$16,466,666.00 dollars** for each defendant(s), singularly and/or jointly; (ii) injunctive relief enjoining the defendant(s) from continuing their harm; and (iii) any other relief deemed just and equitable by the court.

### Violations of Plaintiff's 6th Amendment Rights

**36.**     Plaintiff incorporates by reference sections 1-35 of this Complaint.

The conduct of the appropriate defendant(s) intentionally using a legal process ["Motion-to- Seal-Document"] for the "**improper purpose**" of "hiding evidence" from Mr.

Jackson which would have been used by him to call into question false accusations and false statements made by Lori Mody - the government's witness, and others, constitute "**abuse of process**" and also served to "run afoul" of the long-standing SCOTUS precedent(s) of **Brady vs. Maryland** and **Giglio vs. USA,** thereby violating my **Sixth Amendments Right(s):** to know who my accuser(s) is/are and the nature of the charges and evidence against me.

The conduct of the appropriate defendant(s) conspiring with Lori Mody (CW-1) in exchange for "**sexual favors**" intentionally starting a criminal proceeding (**malicious prosecution**) against plaintiff, knowing that plaintiff was not involved in the scheme to defraud Lori Mody (CW-1) out of $3.5 million, and knowing that plaintiff was not guilty of paying a bribe to US Congressman Williams Jefferson in exchange for official acts.

The defendant(s)' participation in a devious plan to deprive Mr. Jackson of his income and assets was with the intent and full knowledge that their conduct was substantially certain to result in injury and detriment to plaintiff.

As a result of defendant(s) depriving Mr. Jackson of his 6th Amendment rights, plaintiff has suffered an illegal prosecution which caused the following injuries: **(1)** unjust imprisonment and loss of individual liberties for 40 months and 2 years of Supervised Relief, **(2)** shut down of plaintiff's company (iGate, Inc), which is still not a "going concern" today, **(3)** loss of Intellectual Property (U.S. Patents) due to expiration for non-payment of "maintenance fees" while illegally incarcerated, **(4)** defamation of character and loss of plaintiff's blameless good name due to the "Convicted Felon" label placed on plaintiff's name in the public record because plaintiff was illegally allowed to plead guilty in a case involving plain prosecutorial and judicial errors, **(5)** loss

of plaintiff's ability to continue to earn his existing and established salary (**$450,000.00 per year**) in place at the time of the illegal prosecution, continuing until today, and **(6)** loss of access to banking and financial services and individual investors to raise the capital necessary to re-launch plaintiff's products and services into the broadband internet market to bridge the Digital Divide plaguing the under-served and un-served consumers in America and the world.

As a result of the defendant(s)' conduct in depriving Mr. Jackson of his 6th Amendment right(s) to confront his accusers and the evidence against him and depriving him of access to all relevant exculpatory and impeachable material/evidence, plaintiff have suffered harm in excess of **$16,466,666.00 dollars.**

WHEREFORE, plaintiff respectfully request judgments of the court against all of the defendant(s) awarding to plaintiff (i) damages in excess of **$16,466,666.00** dollars for each defendant, singularly and/or jointly; (ii) injunctive relief enjoining the defendant(s) from continuing their harm; and (iii) any other relief deemed just and equitable by the court.

Respectfully submitted,

**Pastor Vernon L. Jackson, Sr.**
**9152 Taylorsville Road**
**#153**
**Louisville, Kentucky 40299**
**502-489-1638**

By: *Vernon L. Jack*
**Vernon L. Jackson, Sr.,** *pro se*

Exhibit A

November 3, 2021

The Honorable Merrick Brian Garland
Attorney General of the Unites States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20503-0001

Subject: FTCA Claim # 157-16-New and Request for DOJ Apology: **Justice Delayed is Justice Denied**

Dear Mr. Attorney General,

In order to re-familiarize you with my case, for context and to provide clarity, I'm attaching a fifteen-year-old New York Time's article titled, "In Case Against Politician, a Tale of Friendship, Ambition and Betrayal". This article provides a good baseline from which to begin notwithstanding information which was hidden with the sealing of both the search warrant and plea documentation. For further context I will share some language from my sentencing hearing by Judge T.S. Ellis, III and Michael Nachmanoff, the Federal Public Defender who represented me.

"Your personal history and characteristics, I think Mr. Nachmanoff has summarized them very briefly. You've lived a blameless life. You have done a lot of good things in your life, and you have accomplished a great deal, starting from a position of relative lack of advantage. You weren't born with a silver spoon in your mouth, and you didn't sort of spring immediately to success. You worked hard for it. I see that. And you have not forgotten the community, and you have worked hard in the community. And I take that also as a given in this. And that is reflected in the Presentence Investigation Report." ... **Judge T.S. Ellis III, September 8, 2006, Sentencing Hearing**

"One of the great tragedies of this case, your Honor, is that Mr. Jackson is a talented Businessman who dedicated much of his adult life trying to provide affordable access to technology to disadvantage communities, not just abroad, but in this country, as well; as the court referred to, the ability to send broadband and video and audio signals over copper wire. It is a tremendous technology that he has great faith in, as do many other people, and have many other people in the past. But the tragedy of this case, in addition to what has happened to him, is that this technology has yet to reach those communities. And that, I think hurts him deeply as anything else." ... **Michael Nachmanoff, Federal Public Defender, September 8, 2006, Sentencing Hearing**

On October 4, 2017, Judge T.S. Ellis III granted the vacatur with respect to the bribery-related counts arising from Congressman Jefferson's interactions with iGate, which followed the lead of the U.S, Supreme Court which ruled unanimously 8 – 0 in favor of Robert F. McDonnell, the former governor of Virginia. Gov. McDonnell's bribery case mirrored that of Congressman Jefferson. Accordingly, Judge Ellis wrote as follows: "that Jefferson took 'official acts' in relation to the iGate scheme within the meaning of the bribery statue as clarified by the Supreme Court's decision in McDonnell", finding: that a properly instructed reasonable jury could not have convicted Jefferson" for his conduct related to iGate and "the overwhelming weight of the government's case with respect to the iGate scheme was focused on **'constituent service' and other activities that were not criminal."**

(1)

Pursuant to the Supreme Court ruling in McDonnell and Judge Ellis' vacatur of Congressman Jefferson's bribery charges related to iGate, on December 13, 2017, I filed for Writ of Coram Nobis (Writ of Error) and Vacatur of Conviction in Judge Ellis' court in the Eastern District of Virginia (EDVA). On March 27, 2019, U.S. District Court EDVA issued an OPINION, stating that my motion for Writ of Coram Nobis and Vacatur of Conviction should be GRANTED. The Court also followed the OPINION with an ORDER, granting my motion for Writ of Coram Nobis and Vacatur of Conviction, stating: **"It is hereby ORDERED that defendant's convictions for (i) conspiracy to commit bribery of a public official, and (ii) bribery as alleged in counts 1 and 2 of the Information, are VACATED."**

**Let me be clear regarding why I'm reaching out to you directly.** As a result of Judge Ellis' granting my motion for Writ of Coram Nobis and Vacatur of Conviction, I filed a damage claim with the Federal Tort Claims Act (FTCA) Section received by the Department of Justice (DOJ) on March 16, 2021. **Because the damages exceeded $10 million it's my understanding that you must personally sign off on the remittance.** The FCTA staff had six (6) months to dispute or challenge my damage claims, which they did not. I sent a fax addressed to FTCA Staff (didn't have a contact name) on September 24, 2021, advising that I did not want to file a lawsuit, but I was certainly prepared to do so if my claim was not settled to my satisfaction. On October 20, 2021, I ultimately heard from Gail Johnson, DOJ Supervisory Trial Counsel, who advised me that she was the person handling my case. Her rationale for not responding to me within the six months mandated by Congress was that the FTCA Staff has been busy. Additionally, she reiterated they had everything they needed from me, with the ball remaining in their court. This kind of response by Ms. Johnson is no longer acceptable nor will it be tolerated. Please allow me to clarify; this kind of response will no longer be tolerated in the dark where lies, smugness and discrimination has been pervasive. Going forward I will shine a light on all of my interactions with the DOJ. I'm attaching a list of seventy plus stakeholders in media, journalists, academia and think tanks who operate at the intersection of the digital divide, technology, courts, criminal justice, and race. To a large degree many of these individuals have a real interest and understanding of the Digital Divide problem and the importance of solving this problem to the future well-being of this country. At a minimum, they all have an interest in equal justice under the Rule of Law … which is something I have yet to experience from the Department of Justice. **Please note all my comments with respect to DOJ's malicious, mean-spirited and discriminatory investigation and prosecution of me are confirmed in DOJ's unsealed Search Warrant documents (Application and Affidavit), on DOJ's websites and public commentary from FBI Agents involved in my case.** Before I address the disparate treatment, I faced from the DOJ it's important that I discuss where we are as a country with respect to solving the Digital Divide problem.

<u>**The Digital Divide**</u>

The late Congressman John R. Lewis describes solving the nation's Digital Divide problem as being one of the biggest Civil Rights issues facing our country today. Dr. Dominique Harrison, Director of Technology, at the Joint Center for Political and Economic Studies, in Washington, DC, describes a kind of "broadband access" redlining which mirrors the redlining we've seen in the housing and banking industries over the last century. The federal government became formally involved with redlining with the passing of the National Housing Act of 1934 and the concurrent establishment of the Federal Housing Administration (FHA) … the FHA formalized the redlining process as part of an initiative to develop the first underwriting criteria for mortgages. Let's be clear regarding the definition of the Digital Divide problem. **This problem is defined by the lack of access to high-speed internet connectivity (broadband access) to unserved/underserved communities, both urban and rural communities. These**

(2)

are communities made up of primarily black people, brown people and poor people of all races. Please understand the reason that this Country doesn't have a solution to the Digital Divide problem is because there's no desire or willingness to do so on the part of big Telecom. This is true despite the U.S. Government's incentives provided to these companies to fix the problem; these incentives consist of monetary and other favorable considerations. You have a major Telecom who has collected tens of billions of dollars of taxes from residents of New Jersey, Pennsylvania and Western Massachusetts, since the early 1990's, with a promise to provide high-speed broadband access by 2010 and this information is a matter of public record. It's now 2021 and little has been done to honor this commitment to the taxpayers of these states. Big Telecom doesn't see solving the Digital Divide problem/providing high-speed broadband access to the unserved and underserved communities across the country as being in their best interest, because they cannot figure out how to do this profitably. This is so because the vast majority of these companies only see "fiber" as a possible solution to the Digital Divide problem. It's impossible to provide the kind of affordability needed to address this problem with fiber. It will never happen.

## Our Digital Divide Solution

We have a broadband over copper final mile solution to solving the Digital Divide problem which utilizes existing telephone line infrastructure. This technology is tried and proven; it is not a pipe dream. Our technology was tested and approved for U.S. Military use worldwide by the Department of the Army Information Systems Engineering Command (USAISEC) – Technology Integration Center (TIC), which is simply referred to as the TIC. White Papers were written by the TIC and multiple other U.S. Military installations which tested and installed our technology. In every instance our product was superior to anything on the market with respect to speed cost, distance, installation time and reliability. In fact, at the time of my capricious prosecution by the DOJ we were in the process of working on the schedule to roll out our product with the U.S. Army, beginning with the Western Region (headquartered at the Ft. Sam Houston Army Base in San Antonio, TX) which at that time consisted of 22 army bases. After the Western Region, the balance of the U.S. Army bases would be rolled out, then U.S. Army bases worldwide with our product also being made available to other branches of the U.S. Military worldwide. Additionally, our product was going to be put in the Army's "tool kit" which was a blanket order type scenario where our product could be ordered worldwide from the tool kit without any further bidding required.

## German Multinational Siemens AG was Our Manufacturing Partner

As I mentioned previously, fifteen years ago our solution/product was superior to anything on the market with respect to speed, cost, distance installation time and reliability. Today, the 2.0 version of our solution would be far superior to anything on the market with costs being pennies on the dollar and installation time being hours/days instead of weeks/months/years.
If you read the attached New York Times article I referenced at the beginning of this letter, you will recall our manufacturing partner was Siemens AG, who also provided the warrantee for our product. Siemens AG is a German multinational conglomerate and a focused technology company headquartered in Munich and is the largest industrial manufacturing company in Europe with branches around the world. Do you believe for one moment that Siemens AG would have been our manufacturing partner if we didn't have a superior product? Of course not. We have been shut down in our ability to secure funding to finish the development on the 2.0 version of our product/solution. **Once we have secured**

the required funding, it will take approximately twelve months to complete the development of the 2.0 version of our product. What this means to the marketplace is that the Digital Divide problem is solved; we would be able to provide 1GBPS symmetrically (up and down) over a distance of one mile (with the ability to repeat for an additional mile) and the bandwidth is designated not shared bandwidth.

## President Biden's Infrastructure Plan

If we used, as an example, President Biden's initial top-level infrastructure bill which proposed $100 billion for broadband we would be able to do the same job with superior bandwidth for approximately $10 billion - $20 billion and reduce installation time by approximately 80% - 90%.
**The reasonable person would conclude that of course the Government would jump all over my company's solution once the efficacy of our product is proven to the Government's satisfaction.** However, in my over twenty years working on a solution to the Digital Divide problem I've found that having a superior product with respect to cost, speed, installation time, distance and reliability doesn't necessarily mean your solution will be welcomed by the decision makers. This is true because the "smart money" is on Fiber: In the minds of the big telecom (and their lobbyists), the industrial military complex (and the Generals), the Halliburton's of the world, Wall Street, investment bankers, hedge funds and the top 1% etc. ... this $100 billion is already spent and it's spent on Fiber which can never be a solution to solving the Digital Divide problem because its too expensive. We have the solution however because of what I consider to be a wrongful, malicious, discriminatory and mean-spirited prosecution by the DOJ, I can't secure funding for the development of our 2.0 solution which essentially entails tweaking our existing technology with our "secret sauce" and updating with current and faster chipsets. **Even though the Supreme Court ruling in the McDonnell case meant I did nothing wrong, and I broke no laws; Even though Judge T.S. Ellis III said I had lived a "blameless" life, I had done many good things, no one had given me anything and I remained faithful to the community. Neither the Supreme Court ruling, nor Judge Ellis' words meant anything to many people, especially to investors and banks who only see me as a black man who is a felon. This is true even though I've been vindicated, and my conviction has been vacated. It's proven to be extremely difficult to put the Genie back into the bottle.**

## Stakeholders' Loss

Concerning my prosecution and the destroying of my Company, multiple stakeholders were/are affected. Those stakeholders would include me, my family, my team/employees, customers (B2B), vendors and shareholders. Besides the aforementioned stakeholders, the big losers are the tens of millions of people in the unserved/underserved communities across the country who have no access to high-speed internet connectivity which affects just about every aspect of daily life from education, health, employment, finance, banking, entrepreneurial opportunities, and even religious services. The hundreds of millions of U.S taxpayers who pay taxes year in and year out for the Government to subsidize big Telecom to solve the Digital Divide problem with little to no success ...  are also big losers.

Forgive me if some emotions seep out, I'm human and the devastation and harm done to me, my family and my company is inexplicable unless you have gone through the same or similar yourself. I had to watch the hurt, sadness and perhaps shame of my wife (Denise) of over forty years, children, grandchildren, family members and friends who had to endure the smearing of my family name and good reputation. I had to watch as the foundation for my family's generational wealth was destroyed in one fell swoop by actions taken by DOJ which I believe to be capricious, nefarious, mean-spirited,

(4)

discriminatory and smug. Most hurtful of all was for me to watch the accelerated deterioration of Denise's already frail health as a result of DOJ 's wrongheaded prosecution of me. Against my advice and wishes I had to watch my very sick wife (who also had a fractured back) make the six and half hour drive from Louisville, KY to Morgantown, VA to visit me at Federal Prison on multiple occasions during my forty months of incarceration. While Judge T.S. Ellis III spoke eloquently regarding my "blameless" life, this "blameless" life did not inspire Judge Ellis to consider my request for an alternate sentencing which would have allowed me to remain home with Denise as her caretaker. I understand that an alternative sentencing may not have been an option for Judge Ellis. Both Denise and I wrote him requesting that he consider an alternative sentencing which would allow me to remain home as her caregiver. We never received the courtesy of a response from Judge Ellis, perhaps this is standard operating procedure. However, I would want to believe that human decency would dictate differently, even for Judge T.S. Ellis III. There was a tremendous price paid by me, my children and my family. Denise died unexpectedly in March 2015, less than five years after my release from Morgantown Federal Prison.

### When Race Is a Factor

I'm a sixty-nine-year-old Black man, a son of the South … I have seen the best and worst that this country has to offer. **For better or worse, or perhaps foolishly I never believed that race discrimination could be an ongoing barrier which could prevent me from achieving anything to which I set my mind.** However, I've learned that previously I lacked the ability to conceptualize the level of race discrimination on steroids which I have experienced at the hands of the DOJ since day one. I do not make this statement lightly nor frivolously. **I'm not interested in relitigating my case, given that the U.S. Supreme Court 8 – 0 unanimous ruling meant that the actions taken against me by DOJ were not legal.** Prior to the Court ruling, I did not believe that I had done anything illegal. After the Court ruling, I felt vindicated and didn't feel anything nefarious was going on with DOJ with respect to my case. I could not have been more wrong. **All of my commentary with respect to the disparate treatment experienced by me (and Congressman Jefferson) is based on information, which is now public, FBI Agents speaking to the media, DOJ website and information regarding DOJ's investigation and prosecution of me which was previously sealed which is now in my possession.**

### Urgency to Seal Search Warrant Documents and Plea Agreement

**From the very beginning the DOJ lied in the Application and Probable Cause Affidavit in order to obtain a Search Warrant for my home and business, filed by FBI Special Agent Edward S. Cooper. If the evidential "tree" is tainted so is its "fruit." This evidence should have been inadmissible in court because it was illegally obtained.** This was on or around July 30, 2005, On August 3, 2005 the Search Warrant was executed in raid on my home and business. On August 4, 2005 the Search Warrant documents (Application and Affidavit) were sealed pursuant to motion made to District Court (Western District of Kentucky), by U.S. Attorney's office around August 1, 2005. **At this point, I didn't feel anything strange was going on, notwithstanding the urgency with which the U.S. Attorney sought and obtained the sealing of the Search Warrant.**

On May 3, 2006, Judge Ellis presided over my Plea Hearing in which I agreed to plead guilty to (Count 1) conspiracy to commit bribery and (Count 2) bribery of U.S. Congressman William J. Jefferson for performing 'official acts' on behalf of my company iGate Incorporated. I agreed to this Plea Agreement only after having been badgered by Mark D. Lytle, Assistant United States Attorney and my Federal Public Defender Michael Nachmanoff. For me to secure the Plea Agreement, I had to agree to the

(5)

following: **"waive all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case."** I found it extremely strange that the DOJ would make denying me access to any documents/information pertaining to the investigation or prosecution of my case a condition of my Plea Agreement. Even so, I was too green in the ways of DOJ to realize anything nefarious was going on. **It would be almost fifteen years later before I found out why the DOJ's urgency in sealing all the Search Warrant documents and denying me access to any information pertaining to the investigation or prosecution of my case.**

### FBI and U.S. Attorney Office Awarded for Overturned Prosecutions

Below, in quotes, is a paragraph lifted from the DOJ website the Office of Public Affairs for immediate release dated October 17, 2012: **Attorney General Holder Recognizes Department Employees and Others for Their Service at Annual Awards Ceremony**

**"The 14th and final Distinguished Service Award is presented to team members for their exceptional contributions in connection with the landmark investigation and prosecution of** former Congressman William J. Jefferson and his co-conspirators. **The investigation, which commenced in March 2005 while Jefferson was a sitting member of the U.S. House of Representatives, culminated in the prosecution and conviction of Jefferson for bribery, honest services fraud, conspiracy, money laundering and Racketeer Influenced and Corrupt Organizations (RICO) violations. In November 2009, Jefferson was sentenced to serve 13 years in prison, the longest sentence ever imposed for a current or former member of Congress."**

Among the recipients of the 14th and final Distinguished Service Award were at least three people involved in my investigation and prosecution: Mark D. Lytle, Assistant U.S. Attorney (federal prosecutor), who it was announced on June 9, 2021, on the website of Washington, DC law firm Nixon Peabody, "Former Senior DOJ Official and Decorated Federal Prosecutor Joins Nixon Peabody's Government Investigations & White-Collar Defense Practice." **The Nixon Peabody announcement highlights the fact that Mr. Lytle was the lead prosecutor in the case of U.S. v. William J. Jefferson, most notable for $90,000 in cash found in the congressman's freezer. Representative Jefferson was convicted of various corruption charges. However, there was no reference to the fact that in the Supreme Court's ruling in McDonnell which more narrowly defined "official act" resulted in Judge T.S. Ellis III having to toss out seven of ten charges against Congressman Jefferson. The two charges involving me and my company iGate, Inc. were among the charges tossed by Judge Ellis,** which resulted in me filing petition for and being granted a Writ of Coram Nobis (Writ of Error). Additionally, there was no mention of the FBI's raid on Jefferson's office being ruled unconstitutional by the U.S. Court of Appeals for the District of Columbia. **It may be difficult for many to understand, but incomplete representations or misrepresentations like that in the Nixon Peabody announcement continues to pour salt in the wounds of me and my family, and they make it more difficult to get my business back on track which is in the welfare or well-being of the general public ... solution to the Digital Divide.** Additionally, from the FBI's Washington Field Office Supervisory Agent Timothy R. Thibault and Special Agent Edward S. Cooper who signed the application and affidavit for Search Warrant.

### FBI Agent Timothy R. Thibault's Meeting at New Orleans FBI Branch Full of Bravado and Lies

**On March 6, 2013, Gordon Russell, then a Staff Writer for the Times Picayune newspaper in New**

Orleans wrote an article titled; " Lead agent in William Jefferson's corruption case recalls victories, near misses," which I found to be a very disturbing article which disparaged me with overtly racist comments and inferences coming from Special Agent Timothy R. Thibault who by this time was behaving in a very smug and arrogant manner with respect to my case. These comments were made at the FBI's New Orleans branch where he had gone to make a presentation on Jefferson's and my cases. At this point, he obviously saw no need to put a check on the words which came out of his mouth. Only five months earlier he had received DOJ's Distinguished Service Award for his exceptional contributions in connection with the landmark investigation and prosecution of former Congressman William J. Jefferson and his co-conspirators. This resulted in Jefferson being sentenced to 13 years in prison, the longest sentence ever imposed for a current or former member. Additionally, just four months earlier the U.S. Supreme Court declined to hear Jefferson's appeal. With me having served forty months in federal prison and Jefferson having exhausted all of his appeals and still in the early stages of serving a thirteen-year prison sentence, Thibault again felt no need to apply discipline to the words coming out of his mouth. This article speaks with pride regarding this history making case, which featured the first-ever raid on the offices of a member of Congress and culminated in the longest sentence ever given to a congressman. I find it extremely perplexing that this article can speak about this first- ever raid on an office of a member of Congress, without also mentioning that the U.S. Court of Appeals for the District of Columbia sided with Jefferson on constitutional issues … the FBI violated the Constitution with this raid. Why was there such celebration for violating the Constitution to prosecute a Black Congressman and give him the longest sentence ever for a current or former member of Congress?  Thibault goes on to say the following about me:" Vernon Jackson, the entrepreneur whose broadband technology Mody had hoped to bring to West Africa, had "a horrible bedside manner" and did "the Heisman on her" shortly after Mody wrote him a check for $3.5 million.

First let me address the "dog whistle" which is Thibault referring to my "horrible bedside manner" with Lori Mody, who happens to be a white woman. Again, I'm a son of the South, born in Charlotte, NC in 1952 and raised there in the 1950's and 1960's. Certainly, there would be consequences for a black man having a "horrible bedside manner" with a white woman because there are many possible consequences. Was he suggesting an Emmett Till moment? One thing is for sure, my bedside manner certainly paled in comparison to the bedside manner of FBI Agent John Guandolo, who was sleeping with Ms. Mody. John Guandolo was part of Timothy Thibault's team, and resigned from the FBI in 2008 at some point after his affair with Ms. Mody became known. Let me share with you some of John Guandolo's greatest hits since leaving the FBI. He is a right-wing conspiracy theorist who makes a living as an anti-Muslim expert. In 2018, BuzzFeed reported that Guandolo said it was 'treason' for former President Obama to address a Muslim organization in the U.S. In the same article he questioned if systemic racism toward African Americans really exists? In a January 8, 2021 Newsweek article, Mr. Guandolo praised the rioting supporters of President Donald Trump for their "restraint" in not killing congressional lawmakers while ransacking the U.S. Capitol. Finally, he says "it is amazing to me that patriots haven't strung up these traitors already with the amount of evidence on the table of what they're doing". It sickens me to know that people with the lack of moral compass' of Mr. Thibault and Mr. Guandolo, who were willing to lie and cheat to prosecute me, sat in positions to destroy my reputation, my business, and attempted to destroy my life. To the point that I did a "Heisman on her" shortly after Mody wrote me a check for $3.5 million; I find this racist "dog whistle" extremely offensive.  Did I strike the Heisman pose, or did I simply take the money and run? I would hope that someone who holds the title of FBI Agent would be enlightened enough to understand that not all 6'4" 250 lbs. black men aspire to the Heisman Award. The awards to which I have aspired and received have all been Engineering, Scientific and Technical awards. Finally, Mr. Thibault knew full well

(7)

that Ms. Mody paid $3.5 million to iGate, Inc. because she was contractually obligated to do so consistent with the term sheet between iGate, Inc. and Ms. Mody's company for the Nigeria license. The FBI/U.S. Attorney certainly knew that there was nothing illegal regarding me collecting the $3.5 million from Ms. Mody which she was contractually obligated to pay because they had the same term sheet with which Ms. Mody and I were working with. However, after my review of previously sealed Search Warrant documents, it's clear that the FBI and U.S. Attorney lied and misrepresented this fact to the Judge.

I want to make two additional points regarding Thibault's meeting in New Orleans where he said the following: "The case was built on the theory that the congressman took bribes in exchange for "constituent services" – using his influence to help Americans do business in Africa. Prosecutors were initially "skeptical" about the case because there was little precedent for it. "If you're a prosecutor, you don't like that," Thibault said. **What Thibault didn't say was the Prosecutors were skeptical because paying bribes for "constituent services" is an oxymoron, because paying for constituent services is legal; paying for "official acts" is illegal. This ill-fated theory was destined to fail, which it did. However, I was collateral damage in DOJ's overzealousness to prosecute Jefferson who was the "big fish" they wanted. However, they had to use lies and misrepresentations in order to investigate and prosecute the case against me. My life was turned upside down and my company shut down with the country still looking for a solution to the Digital Divide which we have. This was all done based on an ill-fated theory that the Prosecutors never really believed in to begin with.**

I'm confused by reporter Gordon Russell making a big deal about Thibault's last slide, from his presentation, which was an arresting image. It was a picture of Jefferson, clad in a business suit for perhaps the last time, holding up a sign with his inmate number --72121-083 – as he prepared to begin a 13 – year prison stint in Beaumont, Texas, on May 4, 2012. The reporter seemed sadden as he lamented that the Times-Picayune efforts to obtain a copy of the photo was in vain; federal appeals courts have ruled that such shots are not public record.

## Equal Justice Under the Law vs. Disparate Treatment

When I look at the two bribery cases within the jurisdiction of the United States District Court for the Eastern District of Virgina (EDVA), it's clear that the parties involved in these two cases were treated differently even though the parties were similarly situated. One bribery case would be that of former Congressman William J. Jefferson and the second case was that of former Governor Robert F. McDonnell of Virginia. Jefferson was convicted on eleven different counts of corruption. McDonnell was convicted on eleven different counts of corruption. Jefferson was sentenced to 13 years in prison. McDonnell was sentenced to two years in prison. The U.S. Supreme Court declined to hear Jefferson's appeal. The U.S. Supreme Court agreed to hear McDonnell's appeal, and put his reporting to prison on hold awaiting their ruling: he never spent a day in prison. The U.S. Supreme Court ruled in McDonnell's favor, more narrowly defined what it meant to pay a bribe. The effect for Jefferson was Judge T.S. Ellis III had to toss seven of the ten most substantive charges in doing so. During this court hearing Judge Ellis went to great lengths admonishing Jefferson that his case was different from McDonnell's and much worst. I'm not a lawyer, but I do know the two cases were similar enough for seven of ten charges against Jefferson to be tossed and the two charges against me were tossed. Jefferson is black and McDonnell is white with McDonnell receiving more favorable treatment even though they were both convicted on eleven counts of corruption. Lori Mody, who paid Jefferson as part of the same distribution contract with which I paid Jefferson, was never charged or sentenced even though I saw a bribery count against her when I saw the

(8)

unsealed Search Warrant documents. I was investigated, prosecuted, sentenced, and served fort months in federal prison. Jonnie R. Williams was the person who was charged with paying a bribe to McDonnell. He admitted that it was his intent to seek quid pro quo. Williams was never charged, sentenced or served anytime in prison. All five of us fall under the jurisdiction of the U.S. District Court EDVA. Jefferson and I, who are black, served prison time. Mody, McDonnell and Williams, who are white, served no prison time.

On July 16, 2009, Sergeant James Crowley of the Cambridge, MA arrested Henry Louis Gates a popular black Harvard History Professor for disorderly conduct. The so-called disorderly conduct by Professor Gates was a result of an argument between he and Sergeant Crowley when Gates took exception to Crowley demanding that he prove he wasn't attempting to break into his own home. Crawley arrested Gates, who by the way had been drinking. However, Gates wasn't drunk: he was highly offended because he had to prove to a white cop that it was his home. He also knew that rarely, if ever, would a white homeowner be subjected to such indignities by law enforcement officers.

When former President Barack Obama learned of the circumstances surrounding his friend Professor Gate's arrest, he said Sergeant Crawley "acted stupidly." There was an immediate outcry in white communities across the country and in Cambridge, MA among police officers and police unions who demanded that the former President apologize for his honest comments. The former President made a call to Crawley and made an apologize which he would not call an apology. However, the apology/non-apology call resulted in Professor Gates, Sergeant Crawley, former Vice President Biden and former President Obama gathering in the White House Garden for the "beer summit" on July 30, 2009. It's unlikely black police officer similarly situated as Crawley would have received an apology/non-apology and certainly there would not have been a beer summit in the White House.

Respectfully, if Sergeant Crawley was deserving of an apology because former President Obama rightfully said he acted stupidly. Certainly, my family and I are owed an apology from the DOJ for destroying our lives, destroying generations of family wealth, for the lies told (and sealed) to obtain a Search Warrant, and for the continued mocking/disparaging of my name long after I had served my forty months sentence. In addition to the remittance of the monies owed to me pursuant to the FTCA, I want a formal apology from the DOJ and every FBI Agent and Assistant U.S. Attorney (AUSA) who participated in the investigation and prosecution of my case. Additionally, I would like to receive an apology from Eric Holder, former U.S. Attorney General and James M. Cole, former Deputy Attorney General for giving a Distinguish Service Award to those who illegally investigated and prosecuted me.

Mr. Attorney General, please take a look at how my overall situation has been handled and let me know whether you feel comfortable with how DOJ has behaved in this matter. Most urgently, please have Ms. Gail Johnson, Supervisory Trail Counsel, in your FTCA section, contact me within five business days of this letter with remittance date and process for me to receive payment for damages I submitted to the FTCA section over seven months ago. FTCA section had six months to dispute any of my damage claims, which they did not. I want to put this ugly saga of my life behind me and get on with the business of providing affordable high-speed broadband to the unserved/underserved communities across this country, both urban and rural.

**Please give me a reason to believe that there is equal justice under the U.S. Rule of Law; this is the belief I had before going through my DOJ nightmare of the last sixteen years.**

Additionally, please let President Biden take a look at how my situation has been handled, and whether he feels comfortable with it. I'm certain he will have a genuine interest in our ability to solve the Digital Divide problem in this country.

Thanks in advance for your timely response and assistance.

Sincerely,

Pastor Vernon L. Jackson, Sr.
**9152 Taylorsville Road**
**#153**
**Louisville, Kentucky 40299**
**Tel: 502-489-1638**
**Email: pastorvljackson@aol.com**